**David Lee SELF et al.,
Appellees/Cross-Appellants,**

v.

**DRIVERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS LOCAL UNION NO. 61, etc., Appellant/Cross-Appellee.**

Nos. 78–1671, 78–1672.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 3, 1979.

Decided April 22, 1980.

* Honorable Walter E. Hoffman, United States District Judge for the Eastern District of Virginia, sitting by designation.

Hugh J. Beins, Washington, D. C. (William M. Nicholson, Charlotte, N. C., on brief), for appellant.

Jonathan Harkavy, Greensboro, N. C. (Henry N. Patterson, Jr., Raleigh, N. C., Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N. C., James J. Caldwell, Charlotte, N. C., on brief), for appellees.

Before BRYAN, Senior Circuit Judge, and WIDENER and MURNAGHAN, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

Local Union No. 61 (Union),[1] appeals from a judgment against it in the United States District Court for the Western District of North Carolina under Section 301 of the Labor Management Relations Act, 1947,[2] for breach of a collective bargaining agreement. The successful parties were 18 members of the Union (plaintiffs), former employees of the Carolina Freight Carriers Corporation (employer),[3] the other party to the agreement.

Commenced November 6, 1970, the action initially named as defendants both the Union and the employer. Plaintiffs sought compensatory and punitive damages, pleading that the employer discharged them in violation of the agreement and charging the

---

1. Drivers, Chauffeurs, Warehousemen and Helpers Local Union No. 61 is an unincorporated labor organization with its principal office and place of business at Hickory, North Carolina. It is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. Section 301 of the Act states:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185.

3. Carolina Freight Carriers Corporation is a motor freight carrier operating interstate in Cherryville, North Carolina.

Union with responsibility for their wrongful discharge by Carolina Freight. They claimed that the Union defaulted in its duty of fair representation by failing, in the grievance proceedings established under the agreement, to press the employees' rightful claims against the employer and by "participating" in their discharge.[4]

The trial court held a hearing on February 12, 1973, and, relying on the procedures established in the collective bargaining agreement, ordered the parties to submit the unlawful discharge issue to the Carolina Bi-State Committee (a joint union-employer grievance committee).[5] Subsequently, the Court accepted the Committee's decision, dated August 8, 1973, that, under the applicable agreement, Carolina Freight Carriers had the "sole and complete right to discharge the plaintiffs as it did." Accordingly, the Court granted the employer's motion for summary judgment.[6]

With a jury waived and after dismissal of the employer, the District Court upheld the plaintiffs' accusations against the Union and assessed the Union with compensatory damages of approximately $600,000.00 as indemnification for loss of wages and other monetary benefits as well as for attorneys' fees.[7] We reverse.

## I.

■ The critical question is whether the asserted omissions and actions of the Union in dereliction of its duties to its members provide a basis for holding the Union liable for losses arising from the discharge of plaintiffs by their employer. In our view, the trial court's conclusion that the Union was thus responsible was not warranted by the fact findings of the District Judge. As the record discloses, the fundamental and proximate cause of the discharges was exclusively the employees' work stoppage, unsanctioned by the Union, together with their continued refusal, for more than 24 hours, to return to work. This behavior squarely contravened the terms of the collective bargaining agreement of which plaintiffs had knowledge; the facts indicate that plaintiffs engaged in it voluntarily, without approval, inducement or deception by the Union.

After a full review of the proof adduced, the District Court made 76 fact findings, outlining the events leading to the work stoppage and the discharges. The prolixity of the evidence is responsible for the seeming intricacy of the findings. Condensed but liberally tracking those of the judge, they follow.

The plaintiffs were employed by Carolina Freight Carriers Corporation as truck drivers until May 25, 1970, when each of them was notified that he was discharged for participation in a work stoppage unauthorized by the Union. On that day they were, and had been for several years, members of the Union, the exclusive collective bargaining agent of all the employees at Carolina Freight's terminal in Cherryville. The Un-

4. The latter ground was allowed after conclusion of the evidence upon a motion made earlier by plaintiffs to amend their complaint.

5. An earlier report of the Committee was rejected by the Court because the decision rested solely on jurisdictional grounds; accordingly, the Court referred the controversy again to the Committee for resolution on its merits.

6. In firing the employees, the employer had invoked the agreement's provision for dealing with unauthorized work stoppages:
    After the first twenty-four (24) hour period of such stoppage and if such stoppage continues, however, the Employer shall have the sole and complete right to immediately discharge any employee participating in any unauthorized strike, slowdown, walkout or any

other cessation of work, and such employee shall not be entitled to have any recourse to any other provision of this Agreement.

7. The District Court filed a memorandum of decision on May 12, 1975, listing the "lapses in duty" the Union was held to have committed. On August 6, 1975, the Court filed extensive and detailed Findings of Fact and Conclusions of Law, holding the Union liable to the employees for the breaches of duty charged. Pursuant to an order of the District Court dated June 2, 1976, the parties submitted a series of stipulations as to the amount of damages due the employees based on the Court's findings as to liability. The District Court entered its final judgment upon all aspects of this case on June 20, 1978.

ion and the employer were parties to a collective bargaining agreement, consisting of both a uniform national agreement, the National Master Freight Agreement, and a North Carolina supplement, for the period of April 1, 1967, to March 31, 1970 (the 1967–1970 Agreement), governing the conditions of employment of the employer's drivers, including plaintiffs. A new agreement, effective from April 1, 1970, to June 30, 1973 (the 1970–1973 Agreement), was in the process of adoption in March and early April, 1970.

According to the District Court's findings, the Union failed to provide its membership with timely and accurate information on the status of the negotiations leading to the adoption of the 1970–1973 Agreement. As a result, many of the drivers believed that the contract had expired on March 31, 1970, and that there was no contract in effect in early April. Reports of strikes and violence by Union members in other States caused further confusion among Carolina Freight drivers. Thus, although new agreements had, in fact, been reached by April 10, 1970, dissatisfied drivers for Carolina Freight congregated across the road from the company's Cherryville terminal on the night of April 11, 1970. At midnight, from 50 to 100 employees began orderly picketing with signs reading "No Contract No Work."

Within approximately four hours, early on the morning of April 12, the picketing employees, served with a temporary restraining order, stopped their protest and left the employer's property. A large number of drivers and their families, a crowd at times exceeding several hundred persons, then congregated on the property across the street from Carolina Freight. Later that day, an order citing 129 drivers, requiring them to show cause why they should not be punished for contempt of the restraining order, was served on the gathered employees, at that time numbering some 200 or more. Neither order specifically required the drivers to return to work.[8]

Between April 11 and April 15, 1970, over 600 of the employer's drivers refused to report for work; many of these joined in the congregation of employees across the street from the employer's facility. During this time, the District Court found, the drivers were unable to secure the presence of the Secretary-Treasurer of the local Union (apparently its chief officer) at the site of the work stoppage, although other officials did appear, urging the drivers to return to work. No Union officials assisted those employees who were compelled by the show-cause order to appear in State court on contempt charges on April 15.[9]

The plaintiffs and the other drivers returned to work on or after April 15, 1970, on the understanding that no employees would be fired for activities during the work stoppage. Within a few days, however, a large number of drivers received letters from the employer announcing its intention to investigate the stoppage and suggesting that disciplinary action might be taken against some employees. On May 15, 1970, the plaintiffs were discharged on the basis of a provision in the 1967–1970 Agreement empowering the employer to dismiss employees participating in an unauthorized work stoppage.[10]

8. In effect, the latter order obstructed their return by requiring the drivers cited to appear in court on April 15—too soon to complete a trip for the employer.

9. Most of the plaintiffs were found innocent of contempt. Some of the plaintiffs, together with other drivers not party to this suit, were found in contempt. All of the contempt convictions, however, were vacated on appeal in the State courts, the restraining order having been held invalid. The drivers had retained an outside attorney to represent them in those proceedings.

10. See note 6 supra. The 1970–1973 Agreement had a corresponding provision but it limited the employer's right to discharge by requiring that the discharge be "uniformly applied to all employees participating . . . ." The District Court found that this 1970–1973 provision was fully effective before the selective discharge of the 18 employees, singled out from the hundreds of drivers involved in the work stoppage. Although this finding would suggest that the employer acted improperly in discharging the plaintiffs, they have not challenged the

The Union did not protest when the employer sent out the letter announcing the investigation and possible dismissal of employees, nor did the Union attempt to prevent the dismissals, despite the Union's awareness of the employer's previous assurances. In addition, the District Court made specific findings illustrating that the Union's representation of the discharged employees in the initial grievance process, in which their complaint had been dismissed on procedural grounds, was inadequate, the Union merely having observed the "bare formalities."

Having sent the employees back through the grievance process for a decision on the merits of their complaint against the employer, the District Court abided by the result announced by the Bi-State Grievance Committee on August 8, 1973, and dismissed the employees' suit against the employer. The Court, however, concluded that the Union both shared responsibility for the employees' discharge and breached its duty to represent those employees fairly in pressing their grievance. The District Court stated that the adverse final decision by the Committee was, in large part, attributable to the Union's breach of duty to the appellees in the initial grievance process. The Court, therefore, held that the Union should be accountable for the plaintiffs' losses up to the time when a full and fair hearing was eventually conducted (the July 31, 1973, rehearing by the Bi-State Committee on the order of the District Court). Thus, the District Court ordered the Union to pay compensation in the form of back pay, losses from lapse of benefits, and allowances from the time of discharge up to the date the

Committee announced its decision (August 8, 1973), plus attorneys' fees and costs.

## II.

Although we accept the factual findings of the District Court, the judgment rendered against the Union cannot stand. The record does not demonstrate that the Union *caused* the conduct for which the plaintiffs were discharged; therefore, the Union cannot be held liable for the losses to the plaintiffs ensuing from their dismissals. The District Court's conclusions rest on mere conjecture—on the assumption that plaintiffs *might* not have been discharged, or *might* have been reinstated but for the Union's improper action or inaction.[11]

Even assuming that the Union's inaction and uncommunicativeness generated an atmosphere of confusion regarding the status of contract negotiations, such a lapse cannot be characterized as "participation" in the employees' dismissals. The employees were aware that their work stoppage had not been authorized by the Union, and they were aware of the consequences of an unauthorized strike under the collective bargaining agreement. There is no showing that the Union actually induced the workers to strike or led them to believe that the strike was endorsed. Whatever the record may show of the Union's shortcomings, it is the plaintiffs who are responsible for the conduct on which their discharges rested.

■ Similarly, despite the District Court's finding of inadequacy in the Union's representation in the initial grievance proceedings, there was no showing that the plaintiffs' dismissals would not have stood

Committee's 1973 decision to the contrary, and the District Court accepted the determination of the Committee as binding.

11. The District Court states:

But for Local 61's participation, by action and inaction, in breach of its duty of fair representation, plaintiffs *might well have* not even been discharged; but for the breach by Local 61 of its duty to fairly represent plaintiffs in the grievance procedure plaintiffs would have had full representation and a fair hearing under the applicable procedure before the Bi-State Committee and an indepen-

dent arbitrator, and *might well have* been restored to their jobs and made whole for their losses in the initial grievance proceedings . . . .
Self v. Drivers, Chauffeurs, Warehousemen and Helpers Local Union No. 61, Civ. No. 2751 (Aug. 5, 1975) at 22 (Accent added).
Moreover, the Court concluded:
Had it not been for the breaches by Local 61 of this duty, plaintiffs *might have* retained their jobs, or *might have* been reinstated in their jobs, and made whole for their losses.
*Id.* at 24 (Accent added).

even had the Union done its duty and pressed their case more zealously. Hence, the judgment of the Court charging the Union with liability for plaintiffs' losses arising from their discharges rests on a false premise and cannot stand. The Union properly does bear responsibility, however, for any expense incurred by the plaintiffs directly as a result of the failure of the Union properly to press their initial grievance against the employer. This resolution comports with authority holding a union liable to its members only for damages attributable to its misconduct. *See Hines v. Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Czosek v. O'Mara,* 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). *Cf. Harrison v. United Transportation Union,* 530 F.2d 558, 562–63 (4th Cir. 1975) (union must compensate employee for lost wages when he has *lost a right of action* against employer under Railway Labor Act because of *deliberately misleading* conduct of union), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976).

It follows that the judgment of the trial court must be reversed as to the liability of the Union for damages, except, however, this court is of the opinion that the plaintiff employees should be awarded a judgment in a reasonable amount to cover their expenses, including attorneys' fees and costs, incurred in seeking a fair resolution of their claim against the employer. For the determination of the amount of the award, this action will be remanded to the District Court.

Vacated and Remanded.