Efthimios A. KARAHALIOS, Plaintiff,

v.

**DEFENSE LANGUAGE INSTITUTE FOREIGN LANGUAGE CENTER PRESIDIO OF MONTEREY; and Local 1263, National Federation of Federal Employees, Defendants.**

No. C–81–2745 RFP.

United States District Court,
N.D. California.

Dec. 31, 1984.

Thomas R. Duffy, Richard DeStefano, Duffy & Milgrom, Monterey, Cal., for plaintiff.

William T. McGivern, Asst. U.S. Atty., San Francisco, Cal., Hermes Fernandez, U.S. Dept. of Justice, Washington, D.C., for defendant Defense Language Institute.

Saul M. Weingarten, Saul M. Weingarten, Inc., Seaside, Cal., Patrick J. Riley, Nat. Federation of Federal Employees, Washington, D.C., for defendant Local 1263, Nat. Federation of Federal Employees.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PECKHAM, Chief Judge.

### I. INTRODUCTION

The plaintiff in this case, Efthimios Karahalios, has for many years been a teacher at the Defense Language Institute (hereinafter "DLI") in Monterey, California.[1] Like the other teachers at DLI, he is within a bargaining unit for which Local 1263 of the National Federation of Federal Employees (hereinafter "the Union") is the exclusive bargaining representative. He is not a Union member, however, and he is not satisfied with the representation he has received from the Union. Specifically, he brought this lawsuit against the Union in 1981, alleging that the Union had mishandled grievances relating to his employment status at DLI, and had thereby breached the duty of fair representation that it owed to him.

He also named DLI as a defendant in his suit, asserting that DLI had refused to arbitrate a grievance he had filed. He maintained that such action constituted a breach of DLI's obligations under its collective bargaining agreements[2] and a violation of his rights to due process and equal protection of the law. The court disagreed with those claims, however, dismissing the equal protection claim and granting summary judgment on the remaining claims against DLI.

But the court declined to grant summary judgment for the Union on plaintiff's claim

---

1. DLI is a federal agency that provides foreign language instruction to United States military and civilian personnel.

2. DLI and the Union were signatories to collective bargaining agreements dated May 5, 1976 and May 15, 1978.

against it. Thus, that claim proceeded to trial before the court on June 20, 1984. The trial lasted two days, and, at its conclusion, the court took the case under submission for consideration and decision. Having since carefully reviewed the evidence presented and the relevant case law, the court now enters its findings of fact and conclusions of law as set forth below.

## II. FINDINGS OF FACT

This dispute arose in 1976, when DLI opened a course developer position in its Greek Department. Two instructors in the Greek Department at DLI sought that position: plaintiff and a man named Simon Kuntelos. For both men, the possibility of being promoted from instructor (pay grade GS–9) to course developer (pay grade GS–11) represented a chance for a substantial increase in pay and prestige.

Both plaintiff and Mr. Kuntelos were well-qualified for the course developer position. Plaintiff had never held the title of course developer, but he had performed course development duties during his long tenure at DLI, and his work had been highly praised. Mr. Kuntelos, in contrast, had previously served as a course developer for DLI for a number of years. He had, however, been demoted to instructor in 1971 when DLI instituted an organizational change eliminating his course developer position.

Upon learning in 1976 that DLI had reopened the Greek Department course developer position, Mr. Kuntelos believed that he was entitled to noncompetitive consideration for that post. DLI did accord him such consideration, but decided not to award him a noncompetitive promotion. It therefore informed Mr. Kuntelos that he could obtain further consideration for the job only by going through DLI's competitive selection procedures, which included a written essay test. Mr. Kuntelos responded to DLI's decision by refusing to participate in the competitive selection procedures. Consequently, DLI gave him no additional consideration in the hiring process, and, early in 1977, it awarded the course developer position to the only person who went through the competitive selection process: Mr. Karahalios.

Although Mr. Kuntelos did not attempt to secure the course developer position through participation in the competitive selection process, he did file a grievance against DLI regarding his nonpromotion. In that grievance, he alleged that DLI had not given him proper noncompetitive consideration.

The Union represented Mr. Kuntelos through the first three stages of DLI's grievance procedure, but was unsuccessful in persuading DLI that Mr. Kuntelos' grievance was meritorious. The next and final step in the grievance procedure was arbitration, a step that could be taken only upon approval of the Union.

To Mr. Kuntelos' satisfaction, the Union decided to request arbitration of his grievance.[3] In making that decision, however, the Union did not seriously consider the relative qualifications of Mr. Kuntelos and Mr. Karahalios,[4] or the effect that arbitra-

---

**3.** Certain evidence in the record arguably suggests that the Union's decision was based on a bad faith policy of favoring Union supporters over other bargaining unit members. Specifically, such an inference could be drawn from Mr. Kuntelos' status as a Union official versus plaintiff's lack of Union membership, Mr. Kuntelos' offer to donate money to the Union if he prevailed in arbitration, and the Union's history of chastising DLI for failing to promote more Union employees (see Plaintiff's Exhibit 42). It is the court's opinion, however, that it need not decide whether to draw that unfavorable inference.

**4.** The Union's president, Rogelio Castro, testified that when the Union officials met to consider arbitration of Mr. Kuntelos' grievance, they discussed the number of years that plaintiff had worked, as well as plaintiff's failure to hold the title of course developer prior to his 1977 selection for that post. But such discussion, assuming it took place, hardly constituted a meaningful examination of plaintiff's credentials, especially because it was not based on information obtained from plaintiff or his personnel file. Moreover, Mr. Castro's testimony before the court was, on the whole, vague and marked by inconsistencies. The court is therefore satisfied that whatever discussion of Mr. Karahalios'

tion might have on Mr. Karahalios' employment status. It neither consulted Mr. Karahalios regarding his course developer qualifications, nor determined his qualifications through an examination of his personnel file. Indeed, it did not even inform Mr. Karahalios that Mr. Kuntelos had filed a grievance.

Mr. Kuntelos' grievance went to arbitration before Alvin J. Goldman on June 22, 1977. The Union did not notify plaintiff of the arbitration hearing, and plaintiff did not learn of the hearing until well after it was over. Thus, plaintiff had no opportunity to present his views to the arbitrator.

Arbitrator Goldman rendered his decision on August 4, 1977. He ruled in favor of Mr. Kuntelos, finding that Mr. Kuntelos had not received proper noncompetitive consideration. To remedy that error, he ordered DLI to reconstitute the course developer selection process in accordance with certain guidelines.[5]

Thereafter, DLI gave Mr. Kuntelos another opportunity to take the written essay test that plaintiff had taken. Prior to administering the test, DLI informed Mr. Kuntelos that it would refer him to the selecting official as a repromotion eligible if he obtained a score of 85 or better.

Although the essay test that Mr. Kuntelos took was the same in content as the one that Mr. Karahalios had taken, DLI's testing procedure was different. Whereas Mr. Karahalios had only been given two hours to complete the test, Mr. Kuntelos was given a full three-and-one-half hours. Further, the tests of the two competitors were graded almost a year apart, and, because each man took the test at a time when no others were taking it, the graders were aware of whose exam they were grading. Most significantly, however, Mr. Karahalios was not afforded an opportunity to take

the exam at the same time and under the same conditions as Mr. Kuntelos.

The graders gave Mr. Kuntelos a score of 83, and Mr. Karahalios a score of 81. Thus, DLI did not refer Mr. Kuntelos to the selecting official as a repromotion. Instead, it referred both Mr. Kuntelos and Mr. Karahalios for competitive evaluation.

The selecting official, Alex Szaszy, considered both candidates and chose Mr. Kuntelos. Accordingly, even though plaintiff had performed satisfactorily in the course developer position for approximately one year, DLI demoted him to the rank of instructor effective May 7, 1978.

Plaintiff then filed two grievances against DLI, one in May of 1978 and one in October of that year. His grievances were lengthy, detailed, and based on numerous grounds. *See* Plaintiff's Exhibits 6 & 7. But one of his major arguments was that DLI should invalidate his demotion because it had used improper testing procedures in selecting Mr. Kuntelos.

Mario Iglesias acted as union representative for plaintiff during the first three stages of the grievance process. Mr. Iglesias believed that plaintiff's grievances were meritorious, yet he was unable to convince DLI of that. On December 20, 1978, DLI completed the third stage of the grievance procedure by denying both of plaintiff's grievances.

Plaintiff then asked the Union to take his grievances to arbitration, and the Union officials met to consider his request. The minutes of that meeting have disappeared, so the details of what transpired are not entirely clear. It is undisputed, however, that the Union rejected plaintiff's request.[6]

■ From the testimony at trial, it further appears that the Union did not base its decision on a discussion of the merits of plaintiff's grievances. Rather, it seems to

---

qualifications occurred at the Union meeting was minimal and insignificant.

**5.** For the specifics of Arbitrator Goldman's award, see his opinion, which is filed as Plaintiff's Exhibit 3.

**6.** Despite Mr. Iglesias' earlier conviction that plaintiff's grievances had merit, the Union's decision was unanimous. Mr. Iglesias testified at trial that he voted against plaintiff in deference to the judgment of the Union's counsel to the advisability of arbitration.

have relied solely on a letter from its counsel advising that arbitrating on plaintiff's behalf would constitute an untenable conflict of interest due to the earlier arbitration for Mr. Kuntelos.[7] Admittedly, the testimony on this point was hardly unambiguous. But the court is confidant that Mr. Iglesias was correct in his assertion that the meeting did not include a discussion of plaintiff's complaints about the testing procedures. The court is also convinced that Mr. Iglesias was not asked to, and consequently did not, describe or comment on the merits of plaintiff's grievances at the meeting. Given the centrality of the testing procedures to plaintiff's grievances, as well as Mr. Iglesias' familiarity with the grievances through his role as plaintiff's representative in the grievance process, those omissions strongly suggest that the Union did not consider the merits of plaintiff's grievances at its meeting. The court therefore finds that the Union's decision regarding arbitration of plaintiff's grievances was grounded on reasons unrelated to the merits of plaintiff's claims.[8]

After plaintiff discovered that the Union would not take his grievances to arbitration, he attempted to obtain an arbitration without the assistance of the Union. But DLI refused to arbitrate, maintaining that it was only compelled to arbitrate upon receiving a request from the Union.

Plaintiff then sought relief against DLI and the Union from the Federal Labor Relations Authority (hereinafter "FLRA"). He charged that DLI had breached its contract obligations when it failed to arbitrate with him, and the Union had breached its duty of fair representation when it refused to request arbitration of his grievances.

The Regional Director of the FLRA disagreed with both of plaintiff's charges. Plaintiff appealed that decision to the General Counsel, however, and the General Counsel overturned the Regional Director's ruling on the charge against the Union. The General Counsel specifically held that the Union had denied arbitration for reasons unrelated to the merits of plaintiff's grievances, and had thus breached its obligation to represent plaintiff fairly. The General Counsel further ordered the case remanded to the Regional Director for issuance of a complaint, absent settlement.

The remand did not result in relief for plaintiff, however. Rather, the Union entered into a settlement agreement with the FLRA, which simply provided that the Union would post the following notice:

WE HEREBY NOTIFY OUR MEMBERS THAT:

WE WILL NOT inform employees that where two or more employees are seeking one position, the Union, the National Federation of Federal Employees, Local 1263, cannot represent all such employees in the contractual grievance procedure.

WE WILL NOT inform employees that it would be a conflict of interest for the Union, the National Federation of Federal Employees, Local 1263, to represent all such employees.

WE WILL NOT in any like or related manner interfere with, restrain or coerce any employees in the exercise of their rights under the Statute.

Plaintiff protested against the settlement, but was unsuccessful in doing so.

Plaintiff then resorted to filing the instant lawsuit. Even before he brought the suit, however, DLI had abolished the Greek Department course developer position due to a lack of funding. Moreover, both plaintiff and Mr. Kuntelos are now close to retirement age. Thus, in applying the law to plaintiff's claim against the Union, the court has been mindful that it would be impossible to effectively reconstitute the

---

7. The Union could have remedied the conflict of interest problem by appointing independent counsel for plaintiff to take plaintiff's grievances to arbitration. But it did not do so, even though plaintiff and the Union's counsel had suggested that course.

8. The court is fully aware that this finding is inconsistent with the representations made in Plaintiff's Exhibit 9, a letter to plaintiff in which the Union's president, Mr. Castro, stated that the Union's decision was based in part on an assessment of the merits of plaintiff's grievances.

course developer selection process a second time.

## III. CONCLUSIONS OF LAW

"It is well established that ... the exclusive bargaining representative of the employees in [a] bargaining unit ... ha[s] a statutory duty fairly to represent all of those employees...." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). Plaintiff argues that the Union breached its duty to him by: (1) failing to consider his perspective when deciding to arbitrate Mr. Kuntelos' grievance, (2) neglecting to notify him of the Kuntelos arbitration and provide him with an opportunity to be heard at that arbitration, and (3) denying arbitration of his grievances. He seeks damages consisting of lost back pay and lost retirement pay benefits, as well as attorney's fees and costs for the instant suit and the suit before the FLRA.

### A. *Breach of the Duty of Fair Representation*

1. *The decision to arbitrate Mr. Kuntelos' grievance.*

■ When a union becomes the exclusive bargaining agent for a bargaining unit, employees within that unit lose the power to bargain individually with their employer. The purpose of the duty of fair representation is to protect such employees from union abuses. The duty stands "as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca,* 386 U.S. at 182, 87 S.Ct. at 912.

■ "A breach of the statutory duty of fair representation occurs ... when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916; *see also Gregg v. Chauffeurs, Teamsters & Helpers Union Local 150,* 699 F.2d 1015, 1016 (9th Cir.1983); *Robesky v. Quantas Empire Airways Limited,* 573 F.2d 1082, 1086 (9th Cir.1978). Arbitrary conduct is sufficient to constitute a viola-

tion; a bad faith motive or intent to hostilely discriminate is not required. *Robesky,* 573 F.2d at 1086. "To comply with its duty, a union must conduct some minimal investigation of grievances brought to its attention." *Tenorio v. N.L.R.B.,* 680 F.2d 598, 601 (9th Cir.1982). "The thoroughness with which unions must investigate grievances in order to satisfy their duty varies with the circumstances of each case." *Id.*

■ It is clear, however, that a union's decision on whether to prosecute an employee's grievance must be "inclusive of a fair and impartial consideration of the interests of *all* employees." *Tedford v. Peabody Coal Co.,* 533 F.2d 952, 957 (5th Cir. 1976) (emphasis added); *see also Smith v. Hussmann Refrigerator Co.,* 619 F.2d 1229, 1236 (8th Cir.) (en banc), *cert. denied,* 449 U.S. 889, 101 S.Ct. 116, 66 L.Ed.2d 46 (1980). The union must consider "not only the interests of [the grievant] but also those of the ... employees who would suffer" should the union successfully take the grievance to arbitration. *Tedford,* 533 F.2d at 959; *see also Tenorio,* 680 F.2d at 602.

■ Thus, when the handling of a grievance deeply implicates the interests of more than one employee, the union should investigate and assess each affected employee's side of the dispute. *See generally Tenorio,* 680 F.2d at 601–03; *Smith,* 619 F.2d at 1237–41; *Automotive, Petroleum & Allied Industries Employees Union, Local 618 v. Gelco Corp.,* 584 F.Supp. 514, 515 (E.D.Mo.1984). For example, when two employees are competing for a position and the union is deciding which employee's position to support, the union must consider the relative qualifications of the employees. *See Gelco,* 584 F.Supp. at 516. In so doing, it may be necessary to inquire of the competitors "about their experience or other qualifications." *Smith,* 619 F.2d at 1240. Failing to take that step may represent a violation of the union's duty of fair representation. *Id.*

■ Those principles apply to the instant case. The Union's decision to arbitrate on behalf of Mr. Kuntelos had a severe effect

on plaintiff, in that it ultimately led to plaintiff's demotion. Yet the Union made no effort to investigate plaintiff's views or qualifications prior to making its decision. Further, the Union showed no concern whatsoever for the consequences that arbitration of Mr. Kuntelos' grievance might have for plaintiff. By demonstrating that level of indifference towards an individual whose interests it was supposed to protect, the Union breached its duty to represent plaintiff fairly.

### 2. *Failure to notify plaintiff of the arbitration.*

The duty of fair representation not only dictates that unions must adequately investigate employee grievances, but also demands that unions shall, under certain circumstances, impart information to an employee or employees. In particular, a union may breach its duty by failing to convey to an employee critical facts about a grievance affecting the employee. *See Robesky*, 573 F.2d at 1088–91. The union need not withhold such information deliberately to violate its duty; it is sufficient if the union's failure to inform the employee is unintentional but "so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *Id.* at 1090.

Courts have applied that standard to situations in which a union has unintentionally failed to notify an employee of the arbitration of another person's grievance. *See, e.g., Smith*, 619 F.2d at 1241–43; *Bond v. Local Union 823, Internat'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 521 F.2d 5 at 9 (8th Cir.1975). The thrust of those cases is that such conduct is arbitrary and illegal if the arbitration could substantially affect the employee's interests, and the employee's position is not adequately presented to the arbitrator. *See Smith*, 619 F.2d at 1241.

Those requirements are met in the instant case. It is indisputable that the arbitration of Mr. Kuntelos' grievance sub-

stantially and detrimentally affected plaintiff. Further, there was no testimony at trial demonstrating that plaintiff's position had been adequately presented to Arbitrator Goldman. Accordingly, the Union's failure to notify plaintiff of the arbitration was a second breach of the Union's duty to represent plaintiff fairly.

### 3. *The refusal to take plaintiff's grievances to arbitration.*

Plaintiff contends that the Union committed a final breach of its duty when it refused to take his grievances to arbitration. The Union has defended against that claim, however, by asserting that plaintiff had no absolute right to have his grievance arbitrated.

The Union's statement of the law is undeniably correct: "A union is not required to take every grievance of its members to arbitration." *Gregg*, 699 F.2d at 1016; *see also Vaca*, 386 U.S. at 191, 87 S.Ct. at 917. But the Union's defense is incomplete. Although unions need not request arbitration of every employee grievance, their ability to deny arbitration is not unconstrained. Rather, a union's rejection of an arbitration request must be based on "an informed, reasoned judgment regarding *the merits* of the clai[m] in terms of the language of the collective bargaining agreement." *Smith*, 619 F.2d at 1237 (emphasis added); *see also Gelco*, 584 F.Supp. at 515; *Dutrisac v. Caterpillar Tractor Co.*, 511 F.Supp. 719, 726 (N.D.Cal.1981).

No such judgment was made in the instant case. Instead, the Union refused plaintiff's arbitration request for reasons unrelated to the merits of plaintiff's grievances. It thereby breached its duty of fair representation for a third time.

It makes no difference that the Union relied on the advice of its attorney in making its decision to reject plaintiff's request. "Reliance on an attorney's advice [does not] insulate [a] union from liability for ... breach of its duty to represent its members fairly." *Gregg*, 699 F.2d at 1017. The Union is therefore accountable for its un-

fair treatment of Mr. Karahalios, regardless of its reliance on the advice of counsel.[9]

**B.** *The Remedy for the Union's Breaches*

Having concluded that the Union failed to fulfill its duty to plaintiff, the court must now determine the proper remedy for the Union's misconduct. "The appropriate remedy for ... breach of a union's duty of fair representation must vary with the circumstances of the particular breach." *Vaca*, 386 U.S. at 195, 87 S.Ct. at 919. Plaintiff has claimed several different elements of damages, which the court analyzes separately below.

**1.** *Lost back pay and retirement pay benefits.*

 The first element of damages plaintiff claims is lost back pay and retirement pay benefits. In deciding whether plaintiff is entitled to recover such damages, it is significant that a union guilty of breaching its duty of fair representation may be held liable only for damages clearly attributable to its improper actions. *Anderson v. United Paperworkers Internat'l Union, AFL–CIO*, 641 F.2d 574, 580 (8th Cir.1981); *Self v. Drivers, Chauffeurs, Warehousemen & Helpers Local Union No. 61*, 620 F.2d 439, 444 (4th Cir.1980); *Soto Segarra v. Sea-Land Service, Inc.*, 581 F.2d 291, 298 (1st Cir.1978). Unions may not be held liable for damage awards based on speculation or conjecture. *See, e.g., Bloom v. Internat'l Brotherhood of Teamsters Local 468*, 752 F.2d 1312, 1313 (9th Cir.1984); *United Steelworkers of America, AFL–CIO–CLC v. N.L.R.B.*, 692 F.2d 1052, 1057 (7th Cir.1982); *DeBoles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1017–20 (3d Cir.1977).[10]

For example, in *Self* the Fourth Circuit overturned a district court's order requiring a union to compensate an employee for lost back pay and benefits. 620 F.2d at 443–44. The Court of Appeals explained that the district court's award could not stand because it "rest[ed] on mere conjecture—on the assumption that plaintiffs *might* not have been discharged, or *might* have been reinstated but for the Union's improper action or inaction." *Id.* at 443 (emphasis in original).

Similarly, in *Anderson* the Eighth Circuit disallowed a severance pay award against a union that had made misrepresentations to the employees it was supposed to represent. 641 F.2d at 578–81. The court reasoned that "[t]he plaintiffs have not proved that but for [the union's] misrepresentations ... they would have obtained their severance pay." *Id.* at 580.

The Ninth Circuit's recent decision in *Bloom* provides an additional illustration. In that case, a union made a false promise to its members in connection with the set-

---

**9.** Moreover, the Union's course of action was not wholly consistent with the advice of its attorney, Saul Weingarten. Although Mr. Weingarten had suggested that the Union appoint independent counsel to take plaintiff's grievance to arbitration, the Union did not follow that course.

**10.** The Fifth Circuit took a different approach in *Abilene Sheet Metal, Inc. v. N.L.R.B.*, 619 F.2d 332, 348 (5th Cir.1980). In that case, an employee had filed a grievance, which his union had mishandled in a manner that made it impossible to subsequently determine the merit of his grievance.

 The majority of courts would have disallowed the employee's recovery due to the uncertainty in the merit of his grievance. But the Fifth Circuit ruled instead that "the uncertainty [should be resolved] against the party that created it by an unlawful act." *Id.*

 The Fifth Circuit's principle of resolving uncertainty against the wrongdoer has a certain appeal. Yet this court is also sensitive to the argument that "[s]pecial caution against excessive awards is counseled in the labor law context where a carefully conceived and administered balance between the rights, powers and duties of union, management and individual employee has been established by Congress on a national scale." *Soto Segarra v. Sea Land Service, Inc.*, 581 F.2d 291, 298 (1st Cir.1978). More fundamentally, however, this court need not thoroughly analyze the wisdom of the Fifth Circuit's approach, because the Ninth Circuit has rejected that approach, *see Bloom*, 752 F.2d 1312, 1313 (9th Cir.1984), and this court must follow the lead of the Ninth Circuit, *see Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

tlement of a labor dispute involving Safeway Stores. The district court held that the union had thereby breached its duty of fair representation and was thus liable for damages "in a measure of the difference between the settlement the union's members actually obtained from Safeway and the settlement they might have obtained by bargaining further instead of believing the union's false promise...." 752 F.2d at 1313 (9th Cir.1984). But the Ninth Circuit overturned the damage award, explaining that "the record did not support the speculative assumption that Safeway would have increased its monetary settlement to the members by $4,000 per person." *Id.*

■ The circumstances of *Self, Anderson,* and *Bloom* are not unlike the ones in the instant case. As in those cases, the court is convinced that the union violated its duty to plaintiff. But, like the courts in *Self, Anderson,* and *Bloom,* the court is unable to say with a reasonable degree of assurance that but for the Union's improper treatment plaintiff would have obtained the pay and benefits he claims. The qualifications of plaintiff and Mr. Kuntelos were simply too evenly matched for the court to find that plaintiff had a clear edge over Mr.

Kuntelos.[11] Thus, the court would merely be speculating if it ruled that plaintiff would have retained the course developer job and earned additional pay and benefits had the Union considered his qualifications in connection with Mr. Kuntelos' arbitration request, allowed him to present his views to Arbitrator Goldman, and assessed the merits of his grievances in ruling on his own arbitration request. Further, at this late date, the court cannot eliminate the need for such speculation by reconstituting the course developer selection process a second time. *See* p. 445, *supra.* Accordingly, the court has reluctantly concluded that it must deny plaintiff's request for lost back pay and retirement pay benefits.

### 2. *Attorney's fees and costs.*

In addition to seeking compensation for lost back pay and retirement pay benefits, plaintiff seeks an award of the attorney's fees and costs he incurred in litigating his claims. That request must be considered as two separate requests: one for the attorney's fees and costs he incurred in his litigation against DLI, and one for the at-

**11.** In drawing the conclusion that plaintiff's qualifications were not clearly superior to those of Mr. Kuntelos, the court has not overlooked the testimony of plaintiff's son, Athas Karahalios, regarding reanalysis of the written essay test that plaintiff and Mr. Kuntelos took. Athas testified that DLI had scored the test using the scoring guidelines set forth in the February 3, 1977 amendments to a government manual dated July 1, 1976. He further asserted that Arbitrator Goldman had mandated use of other guidelines: the ones in the government manual itself, not those in the February 3, 1977 amendments to that manual. According to Athas, if DLI had used the guidelines in the government manual, Mr. Kuntelos would have received an 83, plaintiff would have received an 85, and DLI would have referred plaintiff to the selecting official as a repromotion, thus ensuring plaintiff's reselection.

There are at least three problems with Athas' argument. First, and most importantly, the argument presupposes that plaintiff's test and Mr. Kuntelos' test can be meaningfully compared. Athas apparently would have this court assume that if any distortion of the results occurred due to the gap in testing dates, the difference in testing periods, and the lack of anonimity in

grading, the distortion worked to plaintiff's disadvantage. The court cannot do that, however, because making such an assumption would amount to impermissible speculation.

A further weakness in Athas' analysis is its dependence on the theory that Arbitrator Goldman intended to have DLI ignore the amendments to the July 1, 1976 manual. Arbitrator Goldman's opinion is by no means explicit on that point, and this court is not certain that Athas' interpretation is consistent with the arbitrator's intent.

Finally, Athas' argument rests on the premise that plaintiff would have been selected if DLI had referred plaintiff to the selecting official as a repromotion. While such a result seems likely, the court is aware of no evidence suggesting that the selecting official would have been compelled to hire plaintiff if plaintiff had been referred as a repromotion. Indeed, from Arbitrator Goldman's opinion, it appears that the selecting official would have been free to reject any candidate referred as a repromotion, so long as the selecting official stated his reasons for doing so. Thus, the court would not be justified in using Athas' reasoning as a basis for awarding lost back pay and retirement pay benefits to plaintiff.

torney's fees and costs he incurred in his suits against the Union.

■■■■■■ There is solid support for the former request in the case law. Many courts have held that when a union breaches its duty of fair representation by failing to give proper consideration to an employee's grievance, the employee is entitled to "damages from the union to cover [the] expenses, including attorney's fees and costs, that [he] incurred in seeking a fair resolution of [his] claim against the employer." *Dutrisac*, 511 F.Supp. at 729; *see also Del Casal v. Eastern Airlines, Inc.*, 634 F.2d 295, 301 (5th Cir.1981), *cert. denied*, 454 U.S. 892, 102 S.Ct. 386, 70 L.Ed.2d 206 (1981); *Self*, 620 F.2d at 444; *Scott v. Local Union 377, Internat'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 548 F.2d 1244, 1245–46 (6th Cir.), *cert. denied*, 431 U.S. 968, 97 S.Ct. 2927, 53 L.Ed.2d 1064 (1977). Such an award is "an element of compensatory damages," *Hardesty v. Essex Group, Inc.*, 550 F.Supp. 752, 767 (N.D.Ind.1982); *see also Scott*, 548 F.2d at 1246; *Foster v. Bowman Transportation Co., Inc.*, 562 F.Supp. 806, 818 (N.D.Ala.1983), and is proper even if it is uncertain whether the plaintiff would have prevailed in his claim against his employer, *see Dutrisac*, 511 F.Supp. at 729. Thus, in the case at hand, the Union is clearly liable to Mr. Karahalios for the amount that Mr. Karahalios spent litigating his claim against DLI before this court and before the FLRA.

Different considerations apply to plaintiff's request for reimbursement of the attorney's fees and costs he sustained in suing the Union. Plaintiff contends that such an award is necessary "to completely redress the [U]nion's breach." Plaintiff's Trial Brief, filed 6/12/84, at 18.

■■■■■■ It is clear, however, that "attorney's fees incurred in bringing a [fair representation] action do not arise to the status of compensatory damages." *Cronin v. Sears, Roebuck & Co.*, 588 F.2d 616 at 619 (8th Cir.1978); *see also Hardesty*, 550 F.Supp. at 767. Further, the "American rule," clearly endorsed in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), is that "attorney fees are not ordinarily recoverable by the prevailing party in federal litigation absent statutory authorization," which does not exist for fair representation actions. *Emmanuel v. Omaha Carpenters District Council*, 422 F.Supp. 204, 210 (D.Neb.1976), *aff'd*, 560 F.2d 382 (8th Cir. 1977).

Nonetheless, there is an important exception to the "American rule." When a plaintiff's suit confers a substantial benefit on others as well as on himself, courts may grant the plaintiff an award of attorney's fees. *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973); *see also Emmanuel*, 422 F.Supp. at 210. That doctrine, termed the "common benefit rationale," has provided a basis for attorney's fee awards in fair representation actions in which the plaintiff " 'necessarily rendered a substantial service to his union as an institution and to all of its members.' " *Harrison v. United Transportation Union*, 530 F.2d 558, 564 (4th Cir.1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976), *quoting Hall v. Cole*, 412 U.S. at 8, 93 S.Ct. at 1947; *see also Emmanuel v. Omaha Carpenters District Council*, 560 F.2d 382, 385 (8th Cir.1977); *Bowen v. United States Postal Service*, 470 F.Supp. 1127, 1132 (W.D.Va.1979), *aff'd in part & rev'd in part on other grounds*, 642 F.2d 79 (4th Cir.1981), *rev'd on other grounds*, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983).

This is an appropriate case for application of the "common benefit rationale." As a result of plaintiff's litigation before the FLRA, the Union agreed to post a notice advising its members of its obligations when two or more employees seek one position. Plaintiff's litigation thus significantly advanced the interests of individual union members by helping to inform them of their rights. Further, plaintiff's suit before this court involved novel jurisdictional issues regarding the ability of federal employees to bring fair representation

actions in federal district court. The court resolved those issues in favor of plaintiff, *see Karahalios v. Defense Language Institute, Etc.*, 534 F.Supp. 1202 (N.D.Cal.1982), so plaintiff's suit serves as a valuable precedent for every federal employee who prosecutes a fair representation claim in federal district court. It is clear, then, that "Mr. Karahalios' actions ... have been responsible for major changes, both nationwide and in [his] local bargaining group." Plaintiff's Trial Brief, filed 6/12/84, at 18. Justice therefore requires that plaintiff receive damages for the attorney's fees and costs he incurred in prosecuting this action, as well as in pressing his charges before the FLRA.

## IV. CONCLUSION

It is clear to the court that the Union breached its duty to plaintiff on three separate occasions. But the court is unable to compensate plaintiff for lost back pay and retirement pay benefits, because it cannot reliably determine whether plaintiff would have retained the course developer position absent the Union's breaches. The court has reached this conclusion with a certain sense of frustration, yet believes that the circumstances of this case leave it with no alternative course. As DLI Commandant Foster commented, plaintiff was the "innocent victim of circumstances beyond his control." Plaintiff's Exhibit 8.

Although the court has denied plaintiff's request for lost back pay and retirement pay benefits, it grants his claim for reimbursement of the attorney's fees and costs he incurred in his litigation before this court and before the FLRA. Plaintiff shall have until January 31, 1985 to file a detailed accounting of those expenses. If the Union has any objections to plaintiff's accounting, it must submit them in written form by February 14, 1985. Once the period for filing objections has elapsed, the court will determine whether a hearing on the amount of plaintiff's award is necessary.

SO ORDERED.