NINA PATTISON vs. LABOR RELATIONS COMMISSION
(and a companion case[1]).

Nos. 89-P-383 & 89-P-384.

Suffolk. September 13, 1990. - January 24, 1991.

Present: DREBEN, KAPLAN, & PORADA, JJ.

*Labor Relations Commission. Labor*, Fair representation by union, Collective bargaining, Damages. *Damages*, Fair representation by union. *Contract*, Collective bargaining contract.

In a proceeding before the Labor Relations Commission on an employee's charge of prohibited practice under G. L. c. 150E, § 10 (*b*)(1), against a union alleging breach of its duty of fair representation, the commission was warranted in concluding that the union had failed to give equal representation to all members of the bargaining unit and that the union had acted arbitrarily in handling the employee's grievance. [15-17]

In a proceeding before the Labor Relations Commission in which an employee established that a union, as her collective bargaining representative, had breached its duty of fair representation in that it failed arbitrarily to press a grievance on her behalf, the commission, in determining whether the employee was entitled to material relief, properly adopted the policy that the employee must first establish that the grievance was not clearly frivolous and that the burden then shifts to the union to demonstrate that the employee could not have succeeded if arbitration had taken place; in the circumstances, where the record showed confusion as to this rule on burdens of proof, the union, on remand, was to be afforded an opportunity to offer additional evidence. [17-21]

Where an order of the Labor Relations Commission awarded back pay damages to an employee against a union which, as her collective bargaining representative, had failed arbitrarily to press a grievance against her employer for wrongful termination, the union's responsibility was to be mitigated by any amount recovered from the employer, either by arbitration or by a court action in the employee's name. [21-23]

In a proceeding before the Labor Relations Commission, an employee, acting separately from her exclusive collective bargaining representative, did not have standing to charge her employer with a prohibited practice

---

[1]Quincy City Employees Union, H.L.P.E. *vs.* Labor Relations Commission.

under G. L. c. 150E, § 10 (*a*)(5) & (6), for alleged failure to carry out a collective bargaining obligation. [23-24]

APPEALS from a decision of the Labor Relations Commission.

*Alan J. McDonald* for Nina Pattison.

*Jean Strauten Driscoll* for Labor Relations Commission.

*David F. Grunebaum* for the employer.

*Robert M. Schwartz* for Quincy City Employees Union, H.L.P.E.

KAPLAN, J. On March 18, 1985, Nina Pattison, a public employee serving at the Quincy City Hospital as director of volunteer services, received a letter from Margaret Corbett, on behalf of the employer Hospital, "terminating" her. She wished to "grieve" her dismissal but, she asserts, her relevant collective bargaining agent, Quincy City Employees Union, H.L.P.E, failed arbitrarily to press the grievance on her behalf and ultimately to request arbitration, thus encompassing violations of its duty of fair representation (DFR).

In undertaking litigation, Pattison would have done well to seek a forum that would allow her to join both the union and the employer, for those parties putatively committed related wrongs. The decisional law in 1985, before the ruling in *Leahy* v. *Local 1526, Am. Fedn. of State, County, & Mun. Employees*, 399 Mass. 341 (1987), left unsettled (and largely unthought of) the question whether or to what extent the Labor Relations Commission (Commission) had "primary jurisdiction" in DFR cases.[2] So Pattison's attorney might have considered choosing between starting an action in Superior Court and bringing charges before the Commission.

---

[2]In *Leahy*, the court held that, except in cases where "there were no facts requiring agency expertise," 399 Mass. at 351, the Commission had "primary jurisdiction" of DFR claims by employees against their unions. In *Johnston* v. *School Comm. of Watertown*, 404 Mass. 24, 27 (1989), the court went on to say that where "there are genuine issues of material fact requiring the [C]ommission's expertise" in DFR cases, it is "inappropriate" for the courts "to assert their jurisdiction before the [C]ommission has had the opportunity to address the issues."

There would be little difficulty in joining the two parties in the court action. Attempting to charge both in Commission proceedings would encounter difficulties, as will appear.

Pattison's counsel chose the Commission route. On August 29, 1985, Pattison filed a charge of prohibited practice under G. L. c. 150E, § 10(b)(1), against the union by reason of its breaches of DFR (Charge MUPL-2883).[3] Recognizing, apparently, that an employer's breach of a "just cause" provision of a labor contract is not itself cognizable as a prohibited practice under the statute, Pattison, with some ingenuity, attempted instead to charge the employer with a prohibited practice under G. L. c. 150E, § 10(a)(5) and (6)[4] for failing to carry out an alleged collective bargaining obligation. This was framed as an obligation to refrain from changing unilaterally the terms and conditions of employment, including changes in the progressive disciplinary procedures for employees and in the just cause standard for dismissal (Charge MUP-6037). When the Commission proceedings were already under way, as described below, Pattison, for better assurance, on December 31, 1985, did commence an action in Superior Court against the union and the employer; the action remains at issue but has not proceeded further.

---

[3]The union practice formally denounced in § 10(b)(1), as appearing in St. 1974, c. 589, § 2, is to "[i]nterfere, restrain, or coerce any . . . employee in the exercise of any right guaranteed under this chapter." The right to fair representation involved here is set out in § 5 (see quotation in text below).

A charge of prohibited union practice under § 10(b)(3) (refusal to participate in mediation and arbitration procedures) was filed by Pattison, but the Commission declined to issue a complaint upon it.

[4]Subsection (a)(5) (inserted by St. 1973, c. 1078, § 2), the more cogent provision, makes it a prohibited practice for an employer to "[r]efuse to bargain collectively in good faith with the exclusive representative as required in section six" (see quotation at note 17, infra). When the Commission issued its complaint, it cited § 10(a)(5) and § 10(a)(1), the latter dealing with employer's interference with employee collective bargaining rights. The Commission elaborated on Pattison's original charge, alleging that the employer failed to comply with the contractual grievance procedure, and unilaterally changed the progressive disciplinary procedure and the just cause standard for dismissal.

After investigation, the Commission issued complaints cor-responding to the charges (although, as to the collective bar-gaining complaint, the Commission was doubtful of its own jurisdiction). Initially the Commission ruled that the com-plaints should be "bifurcated," but it soon changed its mind and ordered them to be consolidated and tried together. Trial before two Commissioners[5] occurred in ten installments over a period of eight months, from August, 1986, to April, 1987. On January 24, 1989, the Commission filed its "Decision" upholding the DFR complaint but dismissing the collective bargaining complaint. The union appeals to this court from the former disposition (appeal No. 89-P-384), Pattison from the latter (No. 89-P-383). See G. L. c. 150E, § 11, par. 4.

*To sum up our views. In No. 89-P-384*: (1) Pattison had the full burden to establish that the union discriminated against her or acted with egregious disregard of her rights as a grievant. The Commission's findings for Pattison on these issues are well supported by substantial evidence, G. L. c. 30A, § 14(7)(*e*). (2) As to Pattison's right to a material remedy,[6] burdens of proof are adjusted in the light of the union's delinquency, which aborted the arbitral process: Pat-tison had to show that her claim of dismissal without just cause was not clearly frivolous; once she did so, the burden shifted to the union to show that the grievance was clearly nonmeritorious. The Commission's findings that Pattison made her prima facie showing, and the union failed in its opposition, are also well supported by substantial evidence. (3) Pattison, having thus succeeded on the facts, was entitled to a "provisional make whole remedy" against the union (the only defending party properly before the Commission), that is, recovery for wrongful dismissal, which, however, is subject to offset by the union. Among other things, this may take the

[5]As the Commissioners presided, they were in a position to appreciate directly the credibility of witnesses.

[6]In addition to any material remedy, the Commission, when it finds a violation of G. L. c. 150E, will usually order that the offending party post a notice at the workplace describing the judgment and stating that the party will cease and desist from such behavior in the future. Such an order was issued in the present case.

form of a division of the liability between the union and the employer.

To revert to the point that the union failed in its burden of overcoming a prima facie case, the union has claimed that the policy of the Commission in imposing that burden was not made clear in the course of the hearings, with the consequence that the union was unsure about the weight of the evidence it had to present. Upon a reading of the whole record, we think the complaint is justified, and will therefore remand the case to the Commission if the union expresses an election to offer additional proof.

*No. 89-P-383*: We agree with the Commission's dismissal of the complaint. Pattison, as employee, could not complain of the alleged bargaining violation on the part of the employer.

*No. 89-P-384 — Duty of Fair Representation*

(1) *Union's violations.* From the inordinately extended record,[7] the Commission has abstracted the following statement, which we consider to be a fair summary of the basic facts.[8]

"Nina Pattison was hired on or about August 14, 1984, as the Director of Volunteer Services at Quincy City Hospital. Her duties were to direct and administer the Hospital's program of volunteer services, including recruiting, orienting, assigning, supervising and evaluating volunteer workers. Her direct supervisor, Margaret Corbett, became dissatisfied with Pattison's progress in recruiting new volunteers, organizing a program to orient volunteers to the Hospital, and decentralizing the volunteer program. In weekly meetings with Pattison, Corbett discussed these problems and finally met with Pattison and Corbett's supervisor, Doris Sincevich, the Director of Nursing, in January of 1985 about Pattison's progress. After Corbett failed to see sufficient improvement in Pattison's performance, Corbett recommended to Sincevich in March, 1985, that Pattison be terminated. Early in March Corbett met with Pattison, told her she was considering Pattison's termination, and asked her to think about resigning. The following day Corbett told Pattison that she was going to recommend to the Director of Human Resources, James Tzamos, that Pattison be ter-

---

[7]About 1,300 transcript pages and 360 pages of exhibits.

[8]We omit from this statement appearing in the Commission's brief the references to the portions of the decision and transcript that support the particulars of the statement.

minated unless she agreed to resign. Corbett did so and her recommendation that Pattison be terminated for poor performance was accepted. During the meeting between Tzamos and Corbett, Tzamos noted that Pattison's probationary period had already expired and stated that they would have to discuss the termination with the Union.

"The Hospital's disciplinary guidelines provide a progressive system for discipline based on 'poor performance,' beginning with a verbal warning, then a written warning, then a suspension and finally termination. Pattison had not received either a formal written warning or a suspension before she was terminated.

"Corbett and Tzamos met with a Union representative and told her that Pattison was to be terminated and that she had been employed for several days beyond the six-month probationary period. The Union representative told Corbett and Tzamos that there could be a problem, and also informed the Union steward of the discussion.

"On March 8, 1985, Corbett and Tzamos met with Pattison and notified her that she was being terminated. Pattison subsequently received a letter of termination from Corbett on March 18. On March 11, Pattison had telephoned the Union's office and spoke with John Keefe, the Executive Director. After hearing that she had not received any written warnings, Keefe told her that he thought he could get her reinstated if she wanted her job back. Pattison told Keefe she was uncertain about that, but Keefe said he would check into her case and get back to her. When Keefe called her back, he told Pattison he could find no record of her being a dues-paying member, and asked her to call the Hospital payroll department and see what she could find out. Pattison found out that no union dues had been deducted from her paychecks, and she tried to call Keefe back on March 13, 14 and 15, and left messages for him. Keefe never returned her calls and Pattison never spoke with Keefe again about her termination.

"After Pattison received the March 18 termination letter from the Hospital, she contacted the Union steward, Dorothy Wassmouth. Pattison told Wassmouth that she wanted to file a grievance about her termination. Wassmouth said, 'You can file a grievance if we say you can file a grievance, and we'll get back to you.' Pattison told Wassmouth that she didn't know why she was terminated, and Wassmouth said she would check into it. After telephoning Wassmouth several times without reaching her, Pattison found a recorded message on her answering machine which stated, 'You have no grievance. As far as we are concerned, you have no grievance. Everything is taken care of, and please don't call this office again.' This was Pattison's last contact with any representative of her Union.

"Pattison then contacted an attorney and on his advice delivered a letter to Corbett on March 25 stating that she was grieving the decision to terminate her employment. Pattison sent a copy of the letter to Keefe, with a cover letter requesting the Union's assistance in processing the grievance and asking for a copy of the current collective bargaining agreement. On

April 2, Pattison, having had no reply from the Employer, wrote to Sincevich that she was now grieving the decision at step two of the grievance procedure. Pattison also sent a copy of this letter to Keefe. After receiving no response at step two, Pattison's attorney sent a similar letter to the Mayor on April 9, with a copy to Keefe, seeking a step three review. A meeting was eventually held between Pattison, her attorney, Tzamos and the Hospital's attorney, but the grievance remained unresolved. On June 19, Pattison's attorney wrote to Keefe requesting [that] he file a demand for arbitration (under the collective bargaining agreement, only the Union could demand arbitration). The Union did not respond and Pattison's attorney wrote a second letter on June 27. The Union received both letters but did not reply. The Union did not assist Pattison in processing her grievance and did not file a demand for arbitration."

It will be seen that union help to Pattison in forwarding her grievance stopped with the revelation that she was (unwittingly, as it turned out) not on the union roll. The Commission drew an inference of cause and effect and held that Pattison had carried her burden of demonstrating that the union was in breach of its DFR, for it is a discriminatory and illegal act for a union to fail to give equal representation in grievance and other matters to all members of the bargaining unit regardless of their union allegiance. See G. L. c. 150E, § 5, inserted by St. 1973, c. 1078, § 2: "The exclusive representative . . . shall be responsible for representing the interests of all such employees [those in the unit] without discrimination and without regard to employee organization membership."[9] See also *Leahy*, 399 Mass. at 348; *Carbone* v. *School Comm. of Medford*, 12 Mass. App. Ct. 948 (1981).[10] The Commission likewise upheld Pattison in her submission that, putting the question of discriminatory mo-

---

[9]It may be noted here that DFR, tracing its origins to rulings of the Supreme Court in the absence of explicit statutory statement, see *Steele* v. *L. & N.Ry.*, 323 U.S. 192, 198-207 (1944); *Vaca* v. *Sipes*, 386 U.S. 171, 177-178 (1967), has in Massachusetts been recognized expressly by statute since 1965. See G. L. c. 149, § 178H(1), inserted by St. 1965, c. 763, § 2, and as in effect prior to St. 1973, c. 1078, § 1. See now G. L. c. 150E, § 5.

[10]There was some reference during the hearings to the case of another nonunion member whose grievance was processed by the union. But besides testimony on the part of the union that an arbitral award went to a nonunion employee, no evidence on the matter was introduced.

tive to one side, the union was arbitrary — perfunctory or worse — in handling her grievance, and this likewise encompassed a violation of DFR. See *Graham* v. *Quincy Food Serv. Employees Assn. & Hosp., Library & Pub. Employees Union,* 407 Mass. 601, 606 (1990); *Trinque* v. *Mount Washington Community College Faculty Assn.,* 14 Mass. App. Ct. 191, 199 (1982). The Commission acknowledged that the level of proficiency required of union management is not an exalted one; it tolerates honest mistake or simple negligence. See *Graham* at 606; *Trinque* at 199; *Baker* v. *Local 2977, State Council 93, Am. Fedn. of State, County & Mun. Employees,* 25 Mass. App. Ct. 439, 441 (1988). See also *Vaca* v. *Sipes,* 386 U.S. 171, 190 (1967); *Amalgamated Assn. of St., Elec. Ry. & Motor Coach Employees of America* v. *Lockridge,* 403 U.S. 274, 301 (1971); *Hines* v. *Anchor Motor Freight, Inc.,* 424 U.S. 554, 563-567 (1976); *Early* v. *Eastern Transfer,* 699 F.2d 552, 555 (1st Cir. 1983). Here the union's fault was egregious.

The Commission's decision on both scores seems to us unimpeachable even if we were to attach no significance to the respect that is due to this agency with its accumulated expertise in the field. See *Quincy City Hosp.* v. *Labor Relations Commn.,* 400 Mass. 745, 749 (1987); G. L. c. 30A, § 14. See also note 5, *supra.*

The union, with some support from the employer, has offered several possible justifications of its behavior.

It sought to establish that Pattison was not in fact a member of the bargaining unit. However, her immediate predecessor in the job, although having a different title, did roughly the same work, and was admittedly a member. Then it was suggested that Pattison held a "managerial" post. But the predecessor's position was not so characterized, and examination of Pattison's relation to her superiors also tended to belie the characterization. These contentions have evidently been abandoned on the present appeal.

The union tries to demonstrate that Pattison, in pursuing her grievance from step to step without union help, did not follow the timetable prescribed in the collective bargaining

agreement, and thus forfeited any claim. Pattison says that in point of fact she did comply with the time requirements. There is evidence, too, that in practice the parties permitted considerable leeway in meeting the formal time limits of the agreement. So also there is ground for belief that the issue of timeliness is not a real one, but is interposed as an afterthought.

After her dismissal, Pattison said she was not sure she wanted reinstatement, and she said repeatedly that she wanted to know why she had been fired, wherein her performance had been deficient. The union claims it acted reasonably in taking Pattison at her word and assuming that she was interested in an explanation, but not in a positive remedy. On the other hand, Pattison did proceed to "grieve," and Wassmouth evinced an understanding that Pattison wanted more than an explanation. The attorney's final demand upon the union to request arbitration is of course explicit to the same effect.

The Commission did not err in rejecting the union's attempted justifications.

(2) *Pattison's right to a remedy.* Notwithstanding the union's breach of DFR, in logic Pattison should not be entitled to material relief[11] if her basic grievance was in fact so weak, her performance on the job so poor, that her chances before a reasonable arbitrator were minimal or hopeless. Accordingly, in light of all the equities, the Commission has here adopted as a policy the proposition that an employee in Pattison's position must establish that his or her grievance was not clearly frivolous; the burden then shifts to the union to demonstrate that the grievance was clearly without merit, that the employee could not have succeeded if arbitration had taken place.

On the present record, the Commission could well decide that Pattison presented a prima facie case of wrongful dismissal. Whether her handling of the difficult and rather amorphous volunteer problem in the short period of her ten-

---

[11]Cf. note 6, *supra.*

ure was reasonably adequate, is perhaps open to debate. But it is certain that she was not given the benefit of the hospital's progressive discipline policy nor furnished with the culminating pretermination written warning. The Commission could also hold that the union on its part did not overcome Pattison's prima facie case and sustain its burden of countervailing proof. As noted above, the union does seem to have reason for the contention that the ground rule on burdens of proof was left in some confusion during the hearings. In fairness, if the union indicates a wish to offer additional proof, the case will be remanded to the Commission to receive and evaluate it.[12]

The Commission's very policy or ground rule is challenged but appears quite tenable as a determination by the responsible agency with specialized knowledge and experience in the field. The Commission could hold that it would be little short of incongruous to cast on the employee the whole burden of convincing the Commission that he or she would more probably than not have succeeded before a rational arbitrator in the normal course. The opportunity to lay the matter before an arbitrator in the ordinary way has been lost precisely because the union has failed in its duty to represent the employee. Therefore, the union should bear the ultimate risk of uncertainty as to how an arbitrator would have decided the grievance.

The Commission's policy regarding the relative burdens of employee and union accords with that of the National Labor Relations Board (Board) as enunciated in *United Rubber, Cork, Linoleum & Plastic Wkrs. of Am., Local 1250 (Mack-Wayne Closures)*, 290 NLRB No. 90 (July 29, 1988) (*Mack-Wayne II*). The Board said, discussing the union's "shifted burden of proof," that "absent a determination on the merits pursuant to the agreed-on procedure, the outcome

---

[12]The Commission states in its decision herein that its future policy will be to draw a distinct line between the employee's burden and the union's, and allow the union to defer presenting its opposing evidence until the employee has exhausted his or her prima facie case. (See p. 71, note 67, of the Commission's decision, where the policy is elaborated.)

of the employee's grievance cannot be certain. This uncertainty, however, is due directly to the fact that the union violated its statutory duty. In keeping with traditional equitable principles that the wrongdoer shall bear the risk of any uncertainty arising from its actions, the union must bear the ultimate risk of any uncertainty regarding the 'merits' of the grievance." Slip op. at 7, footnote omitted.

The Board also pointed out that the employee is not unduly favored by the policy. In a typical disciplinary arbitration proceeding, the Board said, the employee enjoys the tactical advantage that the employer, as a practical matter, assumes the full burden of justifying the action it took against the employee: the employee typically may "sit back and force the employer to 'make its case.'" *Id.* at 8. This advantage the employee loses by reason of the union's delinquency. A further loss so caused is the opportunity to plead for a reduced sanction, even if the employer is found to have had "just cause" for the discharge.

On the other side, the policy does not unduly disfavor the union, which ordinarily has full access to the facts about the merits of the grievance, and is aided by its developed understanding of the "common law of the shop." The Board stressed that the policy "does not impose a punitive remedy here, nor do we establish an irrebutable presumption of merit or a per se entitlement to back pay." *Id.* at 8-9, footnote omitted.[13]

---

[13]In the Federal scheme, an employee, claiming breach by the union of DFR and unjust discharge, can sue both the employer and the union in Federal or State court under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1988); the National Labor Relations Board does not have "primary jurisdiction" in the sense of our *Leahy* case. If the employee is successful, the back pay liability is equitably apportioned — see note 15 *infra*.

In the presence of § 301, employees do not often proceed before the Board in the circumstances mentioned; when they do, as they may, see *Miranda Fuel Co.*, 140 NLRB 181 (1962), they face our difficulty, namely, that the employer cannot be joined for the alleged breach of the collective bargaining agreement by the unjust dismissal. In earlier days, the Board, upon finding a breach of DFR, would simply order the union to attempt to process the employee's grievance. Failing that, the union was held liable for all the employee's damages. See *Port Drum*, 170 NLRB

We need to add that there is nothing in the law of the Commonwealth that makes against the Commission's policy. In the *Leahy* decision, 399 Mass. 341, above cited, a court action for breach of DFR, the trial judge had found that the employee would have succeeded in establishing his grievance before an arbitrator; this made it unnecessary for the court to consider or decide whether it would be enough to base an employee's right to a material remedy against the union that it be shown that an arbitrator could reasonably have found for the employee. *Leahy* refers, at 353-354, to an action for legal malpractice where the plaintiff is ordinarily required to prove that, but for the malpractice, the plaintiff would have succeeded in the action against the third person. This analogy could serve in *Leahy* because, as noted, the trial judge had found that the employee would have succeeded before an arbitrator. But a malpractice analogy is imperfect for the narrow band of proceedings like the present before the Commission. As the Board said in the *Mack-Wayne II* decision: "[W]e find that the special character of the grievance-arbitration process, where the employee is in effect 'presumed' to be 'innocent,' distinguishes duty of fair representation proceedings from attorney malpractice actions. In an attorney malpractice case, the plaintiff has the additional burden of proving that the underlying claim was meritorious because, in the absence of the attorney's malpractice, the plaintiff would still have had to prove the merits of the underlying

---

555 (1968), and 180 NLRB 590 (1970), and a late case, *Henry J. Kaiser Co.*, 259 NLRB 1 (1981). The Federal courts resisted this presumption against unions and generally held, in supposed analogy to the § 301 suits, that the employee must prove the merits of the dismissal claim before recovering from the union. See *NLRB* v. *Local 485, International Union of Elec., Radio, & Mach. Wkrs.*, 454 F.2d 17, 23 (2d Cir. 1972); *United Steelworkers of Am.* v. *NLRB*, 692 F.2d 1052, 1057, 1058 (7th Cir. 1982); *San Francisco Web Pressmen & Platemakers Union No. 4* v. *NLRB*, 794 F.2d 420, 423-424 (9th Cir. 1986). In response to the last two decisions denying enforcement of Board orders, the Board reached the compromise policy announced in *Mack-Wayne II*. This policy has been followed in a number of NLRB proceedings, of which a late one is *Machinists Union Local 2699*, 292 NLRB No. 134 (February 17, 1989). We find no court opinion which considers the policy.

claim." *Id.* at 10-11, footnotes omitted. See also, on the inappositeness of the malpractice analogy in the present situation, *Boston Teachers Union*, 12 MLC 1577, 1588 (1986); *Service Employees Intl. Union, Local 579 (Beverly Manor)*, 229 NLRB 692 n.2 (1977).

(3) *Provisional make whole remedy.* It is relatively easy, in a structural sense, to deal with a case of claimed violation of DFR and wrongful dismissal when both the union and the employer are properly present before a tribunal at the suit of the employee. It is then feasible to decide the DFR and "just cause" questions and, if both are decided for the employee, to apportion the liability in accordance with the defendants' respective deserts. Examples are *Vaca* v. *Sipes*, 386 U.S. at 195-198; *Bowen* v. *United States Postal Service*, 459 U.S. 212, 222-228 (1983); *Reilly* v. *Local 589, Amalgamated Transit Union*, 22 Mass. App. Ct. 558, 572-576 (1986). Cf. *Leahy*, 399 Mass. at 354 n.8. There are inevitable complications where, as here, the litigation is brought before the Commission as the "primary jurisdiction" and only the union remains as respondent in that proceeding.

The Commission's order requires the union to "make Pattison whole" for her loss of earnings from the date of her discharge until she has been reinstated in her job or a similar job at the hospital or has secured similar employment elsewhere (of course Pattison would have to account for her actual earnings, or amounts she could reasonably have earned, since her dismissal). This "make whole" remedy, however, is provisional or contingent, because the employer's possible liability for wrongful discharge remains open — not adjudicated in the Commission's proceedings — and, as the order states, "The amount of compensation for which [the union] is liable will be reduced by any compensation paid by Quincy City Hospital to Pattison for the period during which backpay liability accrues."

To take the contemplated measures in sequence: Under the terms of the order, the union requests the hospital to reinstate Pattison with back pay. Failing this, the union asks the hospital to proceed to arbitration regardless of the expiration

of the contract period for the union to make its request for arbitration. If arbitration occurs — and the employer in the interest of sound labor relations may accede to this procedure even if it is not obliged legally to do so — the problem solves itself.[14]

If arbitration does not occur, the claim of wrongful dismissal must be tested, if at all, by a court action. Such an action is brought in the name of Pattison against the employer and the union. In this lawsuit it is in the union's interest to establish, with Pattison's cooperation, the responsibility of the employer for wrongful discharge; if this claim succeeds, back pay damages are divided between the union and the employer —"according to the damage caused by the fault of each." *Vaca* v. *Sipes*, 386 U.S. at 197.[15] Any recovery from the employer serves to mitigate the union's responsibility under the "make whole" term of the Commission's order. If, for any reason short of a lack of cooperation on Pattison's part, the claim against the employer is not proceeded with or fails, the union's "make whole" responsibility remains in force and is to that extent unmitigated. In the present situation, as noted, an action by Pattison against the union and the employer is already pending in Superior Court and can be activated on the lines just described. A "compliance" ses-

---

[14]If the hospital wins at arbitration, the matter is disposed of. If Pattison wins, the arbitrator may be expected to apportion the damages equitably between the employer and union. Cf. notes 15 and 16, *infra*.

[15]Reverting again to the Federal scheme, in § 301 actions by employee against union and employer, see note 13 *supra*, liability is equitably apportioned where the employee succeeds. In *Bowen* v. *United States Postal Service*, 459 U.S. at 215, 230 & n.19, the employer was held for the damages up to the date when arbitration would have been concluded, had the union timely requested it, and the union was held for the rest (to the time of disposition of the § 301 suit). Justice White, dissenting in part, joined by Justices Marshall, Blackmun, and Rehnquist, thought this inequitable, and would cast primary liability on the employer, for the employer can terminate damages by doing its duty under the collective bargaining agreement not to discharge for less than just cause. 459 U.S. at 230-244. Perhaps flexibility should be allowed on the issue of apportionment. Cf. *Reilly* v. *Local 589, Amalgamated Transit Union*, 22 Mass. App. Ct. at 574-575.

sion before the Commission may be found useful in the end to see to the due completion of the entire litigation.[16]

## No. 89-P-383 — Collective Bargaining

Pattison appeals from the Commission's order dismissing the complaint, brought under G. L. c. 150E, § 10(*a*)(1) and (5), that the Hospital, as employer, violated its duty under G. L. c. 150E, § 6, to negotiate in good faith with respect to terms and conditions of employment. The claimed breaches in bargaining were that the employer did not comply with the provision of the collective agreement that automatically upholds an employee's grievance where the employer fails to answer it within the fixed time limits, and changed unilaterally the progressive discipline system in force in the unit, as well as the standard applied in practice in the discharge of employees for "just cause." (See note 4, *supra.*) We need not pass on the question whether these might be proper charges of breach of the collective bargaining obligation if brought by a union. The fact is that § 6 speaks of negotiation in good faith between "[t]he employer and the exclusive representative," not between employer and employee.[17]   It is common ground that where the union is not in breach of DFR, an employee has no standing to attempt to enforce an employer's duty to bargain: as the Commission points out, a contrary rule would interfere with the union's general prerogative to decide what it will do about alleged bargaining violations, and would interfere also with the employer's natural and justified reliance on having one partner in the bargaining process rather than a multitude. See *Peabody Fedn. of Teachers, Local 1289* v. *School Comm. of Peabody*, 28 Mass. App. Ct. 410, 414-415 (1990).

---

[16]Expenses of pursuing arbitration or the Superior Court action should fall to the union. Choice of attorney should be Pattison's for the arbitration, and the union's for the substance of the Superior Court action, which is in the union's interest.

[17]Section 6, inserted by St. 1973, c. 1078, § 2, provides in part: "The employer and the exclusive representative . . . shall negotiate in good faith with respect to wages, hours, standards of productivity and performance, and any other terms and conditions of employment. . ."

The Commission holds in the present case that stability of labor relations requires that collective bargaining remain a matter between union and employer even in the face of a breach of DFR toward a particular employee. The Commission notes, for example, that legitimate acquiescence in unilateral changes, a common and necessary phenomenon, would be unduly chilled by fears of attacks by individual employees asserting breaches of DFR.

We find no basis for reversing the Commission's reasoned position on the matter, which is consistent with the text and evident design of the labor statute.[18]

*Conclusion.* The Commission's order is affirmed, subject, however, to a remand to the Commission, as explained in this opinion, if, within thirty days of the entry of the rescript herein, the union serves notice that it desires to offer additional evidence.

*So ordered.*

---

[18]Pattison argues that the Commission's regulation, 402 Code Mass. Regs. 15.01(2) (1981), gives the employee here a locus standi, but the language is quite general and simply indicates that there are occasions when an employee may make a charge of prohibited practice under § 10 of the statute: "A charge that any employer or employee organization has engaged in or is engaging in any prohibited practice as defined in G. L. c. 150E, §§ 10(*a*) and (*b*), may be made by an individual, employer, employee, or employee organization."

We add that *Johnston* v. *School Comm. of Watertown*, 404 Mass. 23 (1989), does not support Pattison's position about an employee's right to proceed against an employer, while the case of *Miller* v. *Board of Regents of Higher Educ.*, 405 Mass. 475 (1989), is opposed to that position in principle.