UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 81–2832.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1982.

Decided Aug. 27, 1982.*

Opinion Nov. 16, 1982.

---

* This appeal was originally decided by unreported order on August 27, 1982. *See* Circuit Rule

35. The court has subsequently decided to issue the decision as an opinion.

Carl B. Frankel, Assoc. Gen. Counsel, Pittsburgh, Pa., for petitioner.

Andrew Tranorich, Washington, D.C., Elliott Moore, N.L.R.B., for respondent.

Before BAUER and WOOD, Circuit Judges, and CAMPBELL,** Senior District Judge.

PER CURIAM.

This case arises on a petition by the United Steelworkers of America, AFL–CIO–CLC ("the Union") pursuant to Section 10(f) of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ("the Act"), for review of a Decision and Order of the National Labor Relations Board ("NLRB" or "the Board") issued on September 30, 1981. 258 N.L.R.B. No. 68. Pursuant to Section 10(e) of the Act, the Board has cross-applied to enforce its order. We deny enforcement of the Board's order.

** The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

## I. Facts

Gloria Wiley was a machine operator at Memphis Folding Stairs, Inc. ("the Company") from October, 1977 to January, 1980 when she was discharged for insubordination. Wiley's practice was to drive home during her half-hour lunch break. On January 13, 1980, she left the plant at 11:30 a.m. and found her car blocked by another car, which Wiley recognized as belonging to a foreman. Wiley found the foreman in the lunchroom and asked him to move his car and he agreed to do so. She then went back to her car and waited for approximately 15 minutes. When the foreman did not appear, she returned to the lunchroom to again ask him to move his car; the foreman replied that he would move it when he finished lunch. By the time the foreman moved his car, there were only a few minutes remaining in the lunch period.

Wiley then waited in the hall for Don Bratschi, her foreman and immediate supervisor. When Bratschi came out of the lunchroom, Wiley asked him whether she could start her lunch break late. He said no and directed her to go to work. Wiley refused since she had not yet eaten lunch. Bratschi again asked her to return to work and Wiley again refused. Bratschi then left for the work area. Wiley stopped Jerry Gerrard, the plant superintendent, and asked him if she could take her lunch break. After learning that Bratschi denied her request, Gerrard replied that there was nothing he could do.

Foreman Bratschi advised Alma Hyman, Wiley's department steward, that Wiley had refused to go back to work and asked her to talk to Wiley. Hyman spoke with Wiley, counseling her to return to work as "the best thing for [you] to do." In response, Wiley said, "[I] don't know, . . . ." Wiley then walked back to her machine. Bratschi approached her and asked her to return to work. Wiley again asked if she could go to lunch. Bratschi denied that

request and repeated his request that she return to work. Wiley remained silent. Bratschi asked if Wiley heard him talking to her. Wiley continued to stand mute. Bratschi then fired her.

Following her discharge, Wiley went to Hyman's work station and told Hyman she wanted to file a grievance. Hyman did not have a form on hand so she suggested that Wiley go see the president of the local union. The next contact between the Union and Wiley was the day after the discharge when chief steward James Powell went to Wiley's house. Wiley related what had happened the previous day, including all the facts and circumstances surrounding the discharge. He suggested that she meet him at the guard house outside the plant the next day and he would have a grievance form.

The next day Powell told Wiley he would talk to Gerrard about getting her job back before she filed a grievance. Shortly thereafter, other local union officials arrived and a meeting was held at the guard shack to discuss Wiley's case. Powell, Hester, Hyman, and Lois Johnson, vice president of the local, reviewed the facts leading to the discharge. Wiley was excluded from the meeting. The four unanimously concluded that Wiley did not have a meritorious grievance under the collective bargaining agreement. Although they felt that her case lacked merit, they also decided to let her file a grievance because under the collective bargaining agreement,[1] she could not be prevented from filing once she chose to do so.

At the conclusion of the meeting, Powell provided Wiley with a grievance form. Hester helped Wiley fill out the form and directed her to take the grievance to Hyman for submission to the Company. Allegedly, Hyman had to sign it before it

---

1. The collective bargaining agreement contains provisions relating to the adjustment of employee grievances. The adjustment procedure involves four separate steps. Initially, Art. 7, Sec. 1(a) of the contract provides that griev-

ances shall be taken up "by the employee . . . and/or his department shop steward with the immediate Supervisor within two (2) working days after the occurrence."

could be given to the Company and processed.[2]

Wiley completed the form and took it to Hyman. According to Wiley, she gave the form to Hyman and asked her to hold it until 3:30 p.m. because Powell would be talking to the superintendent about getting her job back. Still according to Wiley, Hyman responded that Wiley should tell Powell that she would turn in the grievance when she got ready. According to Wiley, there was no argument between the two.

Hyman's account, on the other hand, is that when Wiley brought her the grievance form, Wiley became upset and verbally abused her.[3] Hyman responded to Wiley's cursing by refusing to sign her grievance. Hyman nevertheless accepted the grievance and later brought it to Hester. Hester, in turn, submitted the grievance to Powell. Powell did not then file the grievance with the Company. Although it is not clear exactly when it was filed, the grievance signed by Hester and Powell was eventually submitted to the Company.

On April 18, 1980, Wiley filed unfair labor practice charges with the Board against the Union for failing to file her grievance because she criticized Steward Hyman's performance of her official duties. Subsequently, the parties agreed to a settlement, approved by the Regional Director. The agreement provided:

> WE WILL NOT fail or refuse to fairly represent any employee in a bargaining unit represented by us or negligently and carelessly fail or refuse to file and process any employee's grievance.
>
> WE WILL request Memphis Folding Stairs, Inc. to reinstate Gloria Wiley to her former position, or, if it no longer exists, to a substantially equivalent position. If it refuses to reinstate her we

will consider a grievance over her January 13, 1980, termination and pursue it in good faith with all diligence.

> WE WILL make Gloria Wiley whole for any losses she suffered by reason of our failure to promptly file and process her grievance.
>
> WE WILL NOT in any other manner interfere with, restrain or coerce employees in the exercise of their rights guaranteed in Section 7 of the National Labor Relations Act.

The agreement also provided, "Back Pay—The Charged Party will make whole the employees named below by payment to each of them of the amount opposite their name." No amount, however, was included next to Wiley's name. Following approval of the settlement agreement, the Union requested a meeting with the Company. The Company agreed to meet with the Union, but did not waive the collective bargaining agreement requirement that grievances had to be filed within two days of their occurrence.

At the meeting, International Staff Representative Don Bogan intervened on behalf of Wiley. Bogan's preparation for the meeting consisted of a discussion with Staff Representative Wright concerning the circumstances of Wiley's discharge. The record does not indicate whether the Company raised the timeliness defense at the meeting. At the outset, the employer presented several documents relating to the grievance; they consisted of Wiley's disciplinary record including a prior discharge for absenteeism,[4] a written statement describing the latest discharge, and the formal discharge notice. Wiley was invited to comment and was given an opportunity to present her side of the case.

---

**2.** A grievance form can be signed by any officer of the local.

**3.** Hyman speculated that Wiley's anger stemmed from the fact that Hyman did not have a grievance form the previous day.

**4.** The evidence showed that Wiley had been discharged by the Company in September of 1978 because of excessive absenteeism and tar-

diness. She was reinstated, however, as a result of a grievance processed for her by local Union representatives, including two of the same representatives involved in this case. Even after reinstatement, the evidence indicated that Wiley's absenteeism continued during the remainder of 1978 and much of 1979 as a result of which she received a series of written warnings pursuant to Company rules.

Bogan argued that the discussion be limited to "whether or not this woman was terminated for just cause." Bogan requested that the Company reinstate her without backpay. The Company's representatives then caucused to consider Bogan's requests. Following a discussion, they returned and announced the Company's decision to let the discharge stand. As the Company explained, "Wiley had been insubordinate in refusing to go to work notwithstanding three orders that she do so." Moreover, it appears that Wiley's prior record contributed to the Company's decision.

After the meeting, Bogan explained to Wiley the weaknesses in her case and advised her that her chances of winning before an arbitrator would be slim. Ultimately, Bogan determined not to pursue Wiley's grievance to arbitration. He grounded his decision on her admitted refusal to comply with repeated orders by supervisors that she return to work and on the well-settled principle that an employee given an order to work must obey and grieve later. Moreover, Bogan knew that Wiley's prior disciplinary record would be considered by the arbitrator and would not help her cause in arbitration.

## II. The Board's Conclusions and Order

The Board, in agreement with the Administrative Law Judge, found that the Union violated section 8(b)(1)(A) of the Act by refusing to process Wiley's grievance because of Wiley's criticism of Hyman's performance of her official duties. The Board further found that, by not making Wiley whole with backpay for any losses she suffered by reason of the Union's conduct, as well as by failing to process Wiley's grievance through the contractual grievance procedure on its merits, the Union violated the April 21, 1980 settlement agreement.

The Board ordered the Union to cease and desist from the unfair labor practices and from restraining or coercing employees in the exercise of their rights guaranteed by the Act. Affirmatively, the Board directed the Union to request reinstatement for Wiley to her former or a substantially equivalent position, and if such request was refused, to secure the Company's consideration of her grievance and to pursue it in good faith and with due diligence; to make Wiley whole for any lost earnings until such time as she is reinstated or obtains substantially equivalent employment or until the Union secures consideration of her grievance by the Company and pursues it with all due diligence, whichever is sooner; and to post an appropriate notice.

## III. Analysis

The Board makes two broad arguments in support of the NLRB's decision. First, it argues that the Union violated section 8(b)(1)(A) of the Act by refusing to process Wiley's grievance within the two-day period required by the collective bargaining agreement because of Steward Hyman's personal hostility toward Wiley. Second, the Board contends that the Union was properly ordered to reimburse Wiley for the backpay she lost as a result of the Union's failure to pursue her grievance in good faith with all due diligence.

### A. Alleged Breach of Duty of Fair Representation.

The duty of fair representation is a judicially-created doctrine developed by the Supreme Court first in cases arising under the Railway Labor Act, *Steele v. Louisville & Nashville Railroad Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), and then extended to unions certified under the National Labor Relations Act, *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). The duty flows as a correlative obligation from the concept of exclusive representation embodied in section 9 of the Act. *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). The duty of fair representation, implied by section 9(a) of the Act, guarantees employees the right under section 7 to be fairly represented by their exclusive bargaining representative. A union which fails to fulfill this obligation restrains employees in the exercise of their section 7 rights and thereby violates section

8(b)(1)(A) of the Act. *Vaca*, 386 U.S. at 177–78, 87 S.Ct. at 909–10; *Kesner v. NLRB*, 532 F.2d 1169, 1174 (7th Cir.), *cert. denied*, 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593 (1976).

A union breaches the duty of fair representation if it acts on "arbitrary, hostile, or bad faith grounds." *Hoffman v. Lonza*, 658 F.2d 519, 522 (7th Cir.1981); *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793, 799 (7th Cir. 1976). Once having undertaken to process an employee's grievance, a union may not arbitrarily ignore it or handle it in a perfunctory manner. *Kesner*, 532 F.2d at 1174–75. While a union must be allowed considerable discretion in deciding which grievances to present and how to present them, it may not ignore a meritorious grievance. *Vaca*, 386 U.S. at 191, 194, 87 S.Ct. at 917, 918; *Kesner*, 532 F.2d at 1174; *Griffin v. International Union, United Automobile, Aerospace and Agricultural Implement Workers*, 469 F.2d 181, 183 (4th Cir.1972); *Service Employees International Union, Local No. 579, AFL–CIO*, 229 N.L.R.B. 692, 695–96 (1977). Consistent with that principle, courts have rejected any claim for lost earnings against a union which has allegedly breached its duty where the claimant fails to show that its claim against the employer had merit. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *NLRB v. Eldorado Mfg. Corp.*, 660 F.2d 1207 (7th Cir.1981); *Kesner*, 532 F.2d at 1175; *see also Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 631 F.2d 263 (4th Cir. 1980); *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888 (4th Cir.1980); *Self v. Drivers, Chauffeurs, Warehousemen*, 620 F.2d 439 (4th Cir.1980); *NLRB v. International Union of Electrical Radio and Machine Workers*, 454 F.2d 17 (2d Cir.1972); *St. Clair v. Local Union No. 515 of International Brotherhood of Teamsters*, 422 F.2d 128, 132 (6th Cir.1969).

In *Hines*, the Court held that in the context of a lawsuit under section 301 of the Act, to prevail in a fair representation action against either employer or union, a claimant must show not only a breach of the duty, but also that the discharge was contrary to the contract. *Id.* at 570–71. The Court twice affirmed the *Hines* principle in recent decisions. *Clayton v. International Union, United Automobile, Aerospace & Agricultural Implement Workers*, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981); *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981). In *NLRB v. Eldorado Mfg. Corp.*, 660 F.2d at 1214, this court applied *Hines* to dismiss a fair representation complaint under section 8(b)(1)(A) of the Act. We find *Eldorado* dispositive here.

In this case, no tribunal—neither court, arbitration panel, nor the Board—has found that the Company's discharge of Wiley violated the collective bargaining agreement. *See International Union of Electrical R. & M. Workers*, 454 F.2d at 23. Indeed, the Board expressly declined to rule on the merits of the grievance. Rather, the Board characterized Wiley's grievance as "not clearly frivolous" and suggested that the facts "raise[d] questions" as to whether she was discharged for cause. The Board then noted that "any uncertainty with respect to the merits of the grievance is to be resolved in favor of the injured employee and not the wrongdoer." The Board simply *presumed* that "if fully and fairly processed, Wiley's grievance would have been found meritorious and that she would have been reinstated with backpay."

On appeal, the Board asserts that "[e]ven if a more stringent test is applied—namely, that Wiley's grievance would probably have been found meritorious—the record supports a finding of violation." The Board's view, however, is that "[i]t is not [its] function ... to decide the merits of a grievance ...." We disagree; the Board must pass on the merits of the claim to the extent that it affects the Union's liability. Otherwise, an assessment of backpay against the Union might well be speculative and punitive and a windfall to Wiley. *See* Jaffe, *The Judicial Enforcement of Administrative Orders*, 76 Harv.L.Rev. 865, 875 (1963). That result would be clearly at odds with the remedial aims of the Act. *Inter-*

national Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979); Local 60, United Brotherhood of Carpenters v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961); W. Gould, A Primer on American Law 124 (1982). Moreover, we cannot accept the Board's argument regarding a more stringent standard. Since the Board did not apply a "more stringent test," it is not our function to do so.

## B. Backpay.

The Board ordered the Union to "make Wiley whole for any loss of earnings she may have suffered as a result of her discharge by Memphis Folding Stairs, Inc. from January 13, 1980 until such time as she is reinstated ... or obtains other substantially equivalent employment or the [Union] secures consideration of her grievance ... and thereafter pursues it with all due diligence, whichever is sooner ...." We recognize the broad scope of the Board's authority to fashion appropriate remedial orders. NLRB v. J.H. Rutter-Rex Mfg. Co., 396 U.S. 258, 262–63, 90 S.Ct. 417, 419–20, 24 L.Ed.2d 405 (1969); Kesner, 532 F.2d at 1175. Such awards will not be disturbed on review "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).

Despite this narrow standard of review, we cannot enforce the order because it does not effectuate the policies of the Act. The Act's purpose is remedial. Local 60, 365 U.S. at 655, 81 S.Ct. at 877; NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 288, 97 L.Ed. 377 (1953); NLRB v. J.S. Alberici Constr. Co., 591 F.2d 463, 470 n. 8 (8th Cir.1979). Since there was no finding that the grievance had merit, it cannot be said that the Union caused any damage since even if it had acted within two days, Wiley's discharge may not have breached the contract. Therefore, the NLRB is assessing potentially punitive damages against the Union. Moreover, without a finding that the grievance has merit, the Board may be rewarding Wiley for her misconduct. A foreclosed procedure does not create or increase a loss otherwise flowing from a discharge unless it can be said that but for the union's conduct, the employee would have been reinstated. De-Arroyo v. Sindicato, 425 F.2d 281 (1st Cir.), cert. denied, 400 U.S. 877, 91 S.Ct. 121, 27 L.Ed.2d 115 (1970). In this case, we cannot say that but for the Union's conduct, Wiley would have been reinstated since even if the Union had filed within two days, there was no finding that her claim was meritorious.

## C. Settlement Agreement.

Finally, the Union in asserting that the Board's order should be denied enforcement, argues that after Wiley filed unfair labor practice charges against the Union, the Union signed a settlement agreement with the Regional Director agreeing to fairly represent Wiley in contesting her discharge. The settlement agreement contained standard posting and compliance provisions, obligating the Union to take the specific affirmative steps described in the notice. According to the Union, it never breached the agreement and the Regional Director therefore abused his discretion in setting aside the settlement agreement and issuing a complaint in this case. The Board, however, argues that the Union failed to comply with the agreement because it did not reimburse Wiley for "losses she suffered" as a result of the Union's initial refusal to process her grievance and by later processing it in a perfunctory manner. The only unpaid claim identified by the Board is for "backpay," i.e., lost earnings. There is no indication that Wiley incurred legal fees, expert witness charges, or any other expenses.

We find it unnecessary to address the contentions surrounding the settlement agreement. Even if the Regional Director abused his discretion in pursuing Wiley's claim, the Union cannot be assessed damages because there was no finding that

the claim had merit. Moreover, the Board's allegations regarding the Union's good faith in pursuit of her grievance prove nothing unless it can be shown that the Union could have made a different, improved argument based on additional or varying preparation and that a different result would have been produced. *Humphrey v. Moore,* 375 U.S. 335, 350–51, 84 S.Ct. 363, 372–73, 11 L.Ed.2d 370 (1964); *Findley v. Jones Motor Freight,* 639 F.2d 953, 959–60 (3d Cir.1981); *Deboles v. TWA, Inc.,* 552 F.2d 1005 (3d Cir.), *cert. denied,* 434 U.S. 837, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). Finally, employees have no absolute right to have their grievance submitted to arbitration and unions have wide discretion in deciding which grievances to arbitrate. *Vaca,* 386 U.S. at 191, 87 S.Ct. at 917.

IV.

For the foregoing reasons, the Board's order is denied enforcement.