Paul OOLEY, Plaintiff–Appellant,

v.

SCHWITZER DIVISION, HOUSEHOLD
MANUFACTURING INCORPORATED,
United Steelworkers of America and
United Steelworkers of America, Local
1148, Defendants–Appellees.

Paul OOLEY, Sherrard Stevens
and Gerald Martin, et al.,
Plaintiffs–Appellants,

v.

SCHWITZER DIVISION, HOUSEHOLD
MANUFACTURING INCORPORATED,
United Steelworkers of America and
United Steelworkers of America, Local
1148, Defendants–Appellees.

Nos. 90–2729, 90–3104.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 26, 1991.

Decided April 20, 1992.

James B. Mitchell, Jr., Indianapolis, Ind. (argued), for plaintiffs-appellants.

Joel H. Kaplan, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Wayne O. Adams, III, Joseph H. Hogsett, Jeffery M. Mallamad, Bingham, Summers, Welsh & Spilman, Indianapolis, Ind., Andrew D. Roth (argued), Bredhoff & Kaiser, Washington, D.C., Richard J. Swanson, Segal & Macey, Indianapolis, Ind., James B. Robinson, Kircher & Phalen, Cincinnati, Ohio, Michael H. Gottesman, Barbara Bergman, Washington, D.C., for defendants-appellees.

Before BAUER, Chief Judge, WOOD, Jr.,* Circuit Judge, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

At the heart of this appeal are the plaintiffs' rights to pension benefits under a Collective Bargaining Agreement ("CBA") between the plaintiffs' former employer and their representative unions. Specifically, this appeal centers on whether a pension plan contained in this CBA entitled the plaintiffs to accumulate seniority rights so that they could qualify for increased pension benefits. The district court concluded that the CBA did not entitle the plaintiffs

* Judge Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case.

to such increased pension benefits and that the plaintiffs' claims for breach of contract and breach of the duty of fair representation under 29 U.S.C. § 185 lacked merit. Accordingly, the district court granted summary judgment on these claims. This grant of summary judgment is now before this court.

## I.

## BACKGROUND

This is a class action with plaintiff Paul Ooley serving as a class representative. All the plaintiffs are former employees of Schwitzer Division, Household Manufacturing Incorporated ("Schwitzer"). The plaintiffs worked in a Schwitzer plant located in Indianapolis, Indiana. United Steelworkers of America and United Steelworkers. of America, Local 1148 ("the Steelworkers Union" or "the Union") were the plaintiffs' bargaining representatives. A Collective Bargaining Agreement ("CBA") between Schwitzer and the Steelworkers Union regulated the relationship between Schwitzer and its employees. Article 36 of this CBA incorporated by reference a separate pension plan agreement ("the Pension Plan"). The dispute on appeal centers on whether the plaintiffs qualify for an Immediate Broken Service Retirement Pension under subsection 8.2 of the Pension Plan.

In the spring of 1984, Schwitzer announced to the Steelworkers Union and the employees that it was considering closing its Indianapolis plant. The shutdown was to take place either later in 1984 or early in 1985. At the time of the announcement, the CBA was still in effect. However, the CBA was due to expire on August 31, 1985.

After Schwitzer made this announcement, the Steelworkers Union's representatives and Schwitzer officials began to negotiate the terms of the plant closing. After a series of meetings ending in October of 1984, the Steelworkers Union and Schwitzer negotiated a Plant Closure Agreement ("the Closure Agreement").

In negotiating the Closure Agreement, the Steelworkers Union obtained several employee benefits that were not provided for in the CBA. For example, the Closure Agreement provided the employees with severance benefits, payment for accrued vacation time, lifetime insurance benefits for one type of pension, and lump sum payments under another pension. These benefits were not available under the CBA.

Nevertheless, there was one concession that Schwitzer would not make at these meetings. That is, Schwitzer refused to concede that the CBA allowed employees to accumulate seniority status for up to five years after the plant closure so that they could "creep" into an Immediate Broken Service Retirement Pension under Section 8.2 of the Pension Plan ("an immediate pension"). The parties refer to this ability to accumulate seniority rights in order to "creep" into an immediate pension as "creep rights." It was the failure to obtain this additional concession that has resulted in the current litigation.

Because Schwitzer refused to concede this point, the Steelworkers Union proposed a compromise which Schwitzer accepted. This compromise, which is found in Section 3 of the Closure Agreement, allowed the employees to accumulate seniority until August 31, 1985, which was the CBA's expiration date. This compromise allowed a few employees to creep into an immediate pension after the plant closing date. Nevertheless, although all members of the plaintiff class were within five years of qualifying for an immediate pension, the members of the plaintiff class were not able to qualify for an immediate pension by the August 31, 1985, deadline.[1]

After negotiating this agreement, the Steelworkers Union posted notices on the plant's bulletin boards announcing a meeting regarding the plant closure, and the Union mailed notices to employees on layoff status. The Steelworkers Union also

---

**1.** Plaintiffs conceded at oral argument that the language of the Closing Agreement extinguished any accumulation rights that may have existed beyond August 31, 1985. However, the plaintiffs argue that because their ability to creep into an immediate pension plan is a vested right, the Pension Plan, and not the Closing Agreement controls the disposition of this case.

provided the employees with written summaries of the benefits provided in the Closure Agreement.

This preannounced meeting with the employees took place on October 14, 1984. At this meeting, the Steelworkers Union's negotiating committee did not take a position on whether or not the employees should approve the Closure Agreement. After a short discussion, the employees ratified the Closure Agreement with a vote of 185 to 77. All members of the plaintiff class voted against ratification.

After the vote was taken, some members of the plaintiff class contacted the Steelworkers Union's officials in order to determine if they could accumulate up to five years of seniority status after the plant shutdown. In other words, these members of the plaintiff class wanted to know if the Closure Agreement extinguished any creep rights that they may have had under the Pension Plan. If the Closure Agreement did not extinguish the plaintiffs' rights under the CBA, the plaintiffs also wanted to know if subsection 8.2 of the Pension Plan allowed them to elect layoff status and thereby accumulate up to five years of seniority so that they could "creep" into an immediate pension. Schwitzer took the position that neither the Closure Agreement nor the CBA allow the plaintiffs to accumulate seniority for up to five years after the plant shutdown. Then on November 27, 1984, the Steelworkers Union filed a class action grievance on behalf of the employees who claimed they were entitled to such creep rights.

However, on September 12, 1985, the Steelworkers Union announced that it was dropping this grievance. When making this announcement to the plaintiffs, Mr. Kline, a Union attorney, indicated that the grievance was dropped because the Steelworkers Union's outside counsel, after reviewing the CBA, the Closure Agreement, and the relevant law, determined that there was little chance of prevailing on these grievances. However, the record, when read in the light most favorable to the plaintiffs, indicates that the "real reason" the Steelworkers Union dropped this grievance may not have been because the Steelworkers Union thought the claim lacked merit. To the contrary, Mr. Kline admitted to the plaintiffs' former counsel that the Steelworkers Union dropped the grievance because if the plaintiffs prevailed in the arbitration, then this would strengthen the plaintiffs' claim that the Steelworkers Union had breached its duty of fair representation when it negotiated away the plaintiffs' creep rights. Accordingly, the record seems to indicate that the Union dropped the claim partially because the Union thought it had merit.

After the Steelworkers Union dropped the plaintiffs' grievance, the plaintiffs filed a class action in the federal district court against Schwitzer and the Union. This complaint urges that Schwitzer breached the CBA when it refused to permit the plaintiffs to creep into an immediate pension. This complaint also alleges that the Steelworkers Union breached its duty of fair representation when it negotiated away the plaintiffs' creep rights and when it failed to pursue these rights in arbitration.[2]

The defendants motioned for summary judgment. The district court granted the motion for summary judgment on several grounds. First, the district court determined that the plaintiffs' reading of the CBA was "too strained to survive summary judgment" and that the only reasonable interpretation of the CBA precluded the plaintiffs from creeping into an immediate pension. Memorandum Entry Regarding Defendants' Motions for Summary Judgment at 17. This conclusion disposed of the plaintiffs' claims for breach of the CBA. The district court also found another basis for disposing of the plaintiffs' breach of contract claims. That is, the

---

**2.** The plaintiffs' complaint also alleges unfair labor practices and conspiracy. The district court dismissed the unfair labor practices claim for lack of jurisdiction. The district court dismissed the plaintiffs' conspiracy allegations because the plaintiffs failed to allege sufficient facts to support these allegations. The plaintiffs do not challenge these rulings on appeal, and, therefore, we will not address the propriety of these rulings in this decision.

district court determined that the Steelworkers Union and Schwitzer had the authority to amend the CBA and that this authority allowed the Steelworkers Union and Schwitzer to adopt an agreement modifying any creep rights that the plaintiffs might have had under the CBA. Accordingly, the district court determined that the Closing Agreement between the Steelworkers Union and Schwitzer clearly eliminated any creep rights under subsection 8.2 of the Pension Plan beyond August 31, 1985.

The district court then went on to address the plaintiffs' claim that the Steelworkers Union breached its duty of fair representation. The district court concluded that the Steelworkers Union did not breach its duty of fair representation in bargaining away the employees' alleged creep rights under subsection 8.2 of the Pension Plan. One reason for this conclusion was that no such rights existed under the CBA. Again pointing to the fact that the CBA did not provide for creep rights, the district court also concluded that the Steelworkers Union did not violate its duty of fair representation when refusing to arbitrate the plaintiffs' grievance with regard to these creep rights.

The plaintiffs argue that the district court erred in reaching these conclusions. However, we agree with the district court's determination that the only reasonable interpretation of the CBA leads to the conclusion that the plaintiffs could not creep into immediate pension benefits by accumulating up to five years of seniority after the plant closure. As we explain below, this determination helps to dispose of the plaintiffs' claims that the Steelworkers Union violated its duty of fair representation in the negotiation, ratification and arbitration processes, and it helps to dispose of the plaintiffs' claims against Schwitzer for breach of contract. Therefore, we affirm the district court's order for summary judgment.[3]

II.

ANALYSIS

A. *Standard of Review*

We review this decision to grant summary judgment de novo. "We will only affirm the grant of summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1188 (7th Cir.1990); Fed. R.Civ.P. 56(c). In reviewing this grant of summary judgment, we will view the facts in the light most favorable to the plaintiffs, the nonmoving party. *A–Abart Elec. Supply Inc. v. Emerson Elec. Co.,* 956 F.2d 1399, 1401–02 (7th Cir.1992).

B. *Relationship Between Contract Claim and Duty of Fair Representation Claims*

The plaintiffs claim that the Steelworkers Union breached its duty of fair representation in the negotiation, ratification and arbitration processes. This claim is brought under Section 301 of the Labor–Management Relations Act ("LMRA"). *See* 29 U.S.C.A. § 185. The plaintiffs' claim against Schwitzer is also brought under Section 301 of the LMRA. *See id.* This claim is based on breach of the Collective Bargaining Agreement ("CBA"). Article 31 of the CBA, however, requires that employee grievances should be resolved through union/company meetings and that the final step in the grievance process should be binding arbitration. "Courts are not to usurp those functions which collective-bargaining contracts have properly 'entrusted to the arbitration tribunal.'" *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562–63, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976) (citing *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 566, 80 S.Ct. 1343, 1345, 4 L.Ed.2d 1403 (1960)). Accordingly, federal courts should review allegations that an employer breached a collective bargaining agreement that con-

---

**3.** Schwitzer argues that this court has appellate jurisdiction over only plaintiff-appellant Paul Ooley and that this court does not have jurisdic-

tion over the entire class of plaintiffs. A discussion of this issue is found in Section III of this opinion.

tains an arbitration clause only when the employee can prove that " 'the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance.' " *Id.* at 566, 96 S.Ct. at 1057 (citing *Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967)). Therefore, in order to prevail against Schwitzer, the plaintiffs must show that the Steelworkers Union breached its duty to fairly represent the employees in the arbitration process, and it must show that Schwitzer breached the CBA.

■ Because employees choose their bargaining representative, and because most collective agreements contain mechanisms for resolving employee grievances, courts should be reluctant to construe as a matter of law collective bargaining agreements when evaluating whether a union has violated its duty of fair representation. Nevertheless, for reasons that will become clear below, it is sometimes helpful to look at the *arguable* merits of the union's proffered interpretation of a contract in order to determine whether a union breached its duty of fair representation in failing to arbitrate a grievance. Moreover, sometimes it is appropriate for the court to determine if the plaintiffs' contractual claims are meritless as a matter of law. This is one of those cases. We, therefore, begin our analysis by considering whether the plaintiffs' contractual claim lacks merit.

## C. *Interpretation of the Collective Bargaining Agreement*

■ To some extent the disposition of this appeal turns on the construction of the CBA that regulated the terms of the plaintiffs' employment with Schwitzer. The in-

terpretation of contractual language is ordinarily a question for the courts and not the jury. *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 602 (7th Cir.1989) (affirming the district court's grant of summary judgment with regard to the interpretation of an employee benefit plan under ERISA and Section 301 of the LMRA). In fact, the interpretation of contractual documents is an appropriate question for the jury only when the contractual language is ambiguous. *Id.* A contract's language which lends itself to one reasonable interpretation is not ambiguous and, therefore, can be construed as a matter of law. *See Truck Drivers Union, Local 705 v. Schneider Tank Lines, Inc.,* 958 F.2d 171, 175 (7th Cir.1992) (upheld summary judgment based on the "most natural reading" of a collective bargaining agreement); *La Salle Nat'l Bank v. General Mills Restaurant Group, Inc.,* 854 F.2d 1050, 1052 (7th Cir.1988) ("[i]f a judge can make sense of a contract without hearing testimony, his duty is to construe the contract without letting the parties introduce any evidence other than the contract itself."). *See also International Brotherhood of Elec. Workers, Local 47 v. Southern California Edison Co.,* 880 F.2d 104, 107 (9th Cir.1989) (focused on the reasonableness of appellant's proffered interpretation of a collective bargaining agreement in determining whether summary judgment was warranted).[4]

Furthermore, a case involving the interpretation of contractual documents seems to be even more appropriate for construction by a judge as a matter of law, as opposed to a jury, when the party challenging the court's interpretation fails to support its proffered interpretation with ex-

---

4. Considering that the plaintiffs' claims turn on the interpretation of a collective bargaining agreement, we must look to federal labor law, and not state law, to decide this appeal. *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 403–04, 108 S.Ct. 1877, 1880, 100 L.Ed.2d 410 (1988). Accordingly, federal common law applies to the construction of the CBA in the case before this court. *See id.* However, Section 18.8 of the Pension Plan requires that it be construed under the Employment Retirement Income Security Act (ERISA) and the laws of the State of New York.

New York law, like federal law, allows a judge to construe a contract as a matter of law when the language of a contract leads to only one reasonable interpretation. *Namad v. Salomon Inc.,* 74 N.Y.2d 751, 545 N.Y.S.2d 79, 543 N.E.2d 722 (1989). As such, we do not need to address whether or not it violates federal policy, as a matter of federal common law, to rely on New York law in accordance with the Pension Plan's choice of law provision.

trinsic evidence. In this case, the only evidence offered by the plaintiffs in support of their contractual interpretation is the contract and some conclusory post-formation statements regarding what the various parties thought the contract meant. These post-formation interpretations say nothing about what was intended at the time in which the parties entered into the agreement. *See Marentette v. Local 174, United Automobile Workers*, 907 F.2d 603, 612 (6th Cir.1990). Accordingly, the only evidence before us in this question of contractual interpretation is the legal document itself.

■ The district court concluded that the only reasonable interpretation of the CBA leads to the conclusion that the plaintiffs cannot accumulate seniority rights for up to five years after the plant closure in order to creep into an immediate pension plan. The plaintiffs, on the other hand, argue that their interpretation does not lack merit as a matter of law because one reasonable interpretation of the CBA allows for such creep rights.

The immediate pension benefits at issue are provided for under subsection 8.2 of the Pension Plan. Article 36 of the CBA incorporates the Pension Plan into the CBA. Plaintiffs point to several provisions of the CBA which they argue support their interpretation. Included in this list are subsections 3.2, 3.3, 8.1 and 8.2 of the Pension Plan and portions of Article 17 of the CBA.

Section 3 of the Pension Plan is essentially a definitional section. This definitional section defines "continuous service" and "break in continuous service." Both these terms are relevant to the qualification for an immediate pension plan under subsection 8.2. The portions of Section 3 most relevant to this appeal read as follows:

> The term "continuous service" as used in this Agreement [the Pension Plan] means, in the case of a person who is an Employee on or after January 1, 1976, service with the Company or an Affiliated Company prior to retirement or termination of service and prior to the attainment of age 65, calculated from the

Employee's last hiring date in accordance with the provisions as set forth below....

> **3.1** There shall be no deduction for any time lost which does not constitute a break in continuous service....

> **3.2** Continuous Service shall be broken when ...

> (c) The Employee is terminated due to permanent shutdown of a plant, department or subdivision thereof....

> (d) *The Employee is absent due to a layoff or a physical disability either of which continues beyond accumulation limits in 17.2c of the Basic Agreement [the CBA]* ....

> **3.3** *An Employee who would otherwise be terminated under sub-paragraph 3.2(c), may at the time of the shutdown elect to be placed on layoff for 30 days, or to continue on layoff for an additional 30 days if he was on layoff at the time of the shutdown. At the end of such 30-day period he may elect to continue on layoff or be terminated. The continuous service of an Employee who elects a layoff shall be determined under the provisions of sub-paragraph 3.2(d), instead of under the provisions of sub-paragraph 3.2(c).*

(emphasis added).

Article 17 of the CBA defines and outlines an employee's seniority. Seniority under this Article is "an employee's accumulated, credited length of service with the Company in years, months, and days...." Subsection 3.2(d) of the Pension Plan delineates when an employee who is absent due to layoff has a break in continuous service. In doing so, subsection 3.2(d) adopts the accumulation limits in 17.2(c) of the CBA. Under 17.2(c) employees who, like the plaintiffs, started working for Schwitzer four or more years before layoff can accumulate up to five years of seniority. Accordingly, subsection 3.2(d), to the extent it applies to the plaintiffs, would allow the plaintiffs to accumulate five years of seniority.

Section 8 of the Pension Plan, which bears the title "Broken Service Retirement Pension," provides pension benefits for employees who have a break in continuous

service. The plaintiffs point to the following relevant language under Section 8:

8.1 Notwithstanding any other provision of this Agreement, any Employee who shall be laid off and not recalled within the accumulation limits of 17.2c of the Basic Agreement, or whose employment shall be terminated as a result of a permanent shutdown of a plant, department or subdivision thereof, or physical disability *and who at the end of such accumulation limit, or at the date of termination* shall have 15 or more years of continuous service shall be eligible, upon making application therefor in accordance with Section 10.2 of this Agreement, to receive a Deferred Broken Service Retirement Pension, provided his continuous service and age total 55 or more years.

8.2 Any Employee whose continuous service is broken on and after September 1, 1970, by reason of permanent shutdown of a plant or department *or who is initially laid off or physically disabled beyond the accumulation limits of 17.2c of the Basic Agreement and who, at the time of* such permanent shutdown or *such layoff* or physical disablement, had at least 15 years of continuous service and whose age and continuous service totaled 75 or more years shall be entitled to receive an Immediate Broken Service Retirement Pension.

(emphasis added).

All members of the plaintiff class were employees of Schwitzer when the plant shut down. Moreover, all members of the plaintiff class exercised their option under subsection 3.3 to elect layoff status. Upon taking layoff status each of the plaintiffs was entitled under 3.3, 3.2(d) and 17.2(c) to accumulate seniority for up to five years, and, under these same provisions, plaintiffs' continuous service would not be broken until the expiration of this five-year period.

Pointing to the fact that subsections 3.3, 3.2(d) and 17.2(c) allow plaintiffs to accumulate seniority for up to five years, the plaintiffs argue that a reasonable reading of the Pension Plan entitles them to use these five years of seniority benefits to creep into an immediate pension under subsection 8.2. Schwitzer, however, argues that this interpretation is not reasonable.[5] That is, Schwitzer argues that the language of subsection 8.2 plainly precludes the plaintiffs from accumulating seniority rights to qualify for an immediate pension. In support of this position Schwitzer points to the fact that subsection 8.2 specifically states that continuous service is to be determined "at the time of such permanent shutdown," and Schwitzer correctly points out that the plaintiffs had not accumulated enough seniority to qualify for an immediate pension at the time of the plant shutdown.

Nevertheless, considering that the plaintiffs exercised their rights under section 3.3 to opt for layoff status, it is not clear that the above language necessarily controls the disposition of this case. That is, one can reasonably argue that the controlling language for measuring the plaintiffs' continuing service under subsection 8.2 is, "at the time of . . . such layoff." If this is the controlling language, the next question becomes does "at the time of such layoff" mean the date of the shutdown when the plaintiffs supposedly elected layoff status, or does it mean at the end of the five-year accumulation limit set forth in 3.3, 3.2(d) and 17.2(c).

Schwitzer argues that the only reasonable interpretation leads to a conclusion that "at the time of such layoff" means the time in which the plaintiffs first took layoff status. In making this argument Schwitzer emphasizes that "at the time of such layoff" must be referring to subsection 8.2's earlier reference to an employee "who is initially laid off." Schwitzer argues "initial" must mean the time when an employee first takes layoff status. Accordingly, Schwitzer argues that the only reasonable interpretation of this provision is that con-

5. The Steelworkers Union did not join Schwitzer's position with regard to the interpretation of the CBA. Instead, the Steelworkers Union invites this court to decide this case on other grounds. We decline this invitation.

tinuous service is determined at the time in which the employees first opted to take layoff status.

A comparison between subsections 8.1 and 8.2 supports Schwitzer's argument that "at the time of such layoff" means the time in which an employee elects layoff status. Subsection 8.1 sets forth the requirements for a deferred pension. Subsection 8.1 expressly states that *"any Employee who shall be laid off and not recalled within the accumulation limits of 17.2c of the Basic Agreement ... and who at the end of such accumulation limit ... has 15 or more years of continuous service ..."* is eligible to a deferred pension, "provided his continuous service and age total 55 or more years." (Emphasis added.) Because subsection 8.1's clear language allows employees to accumulate seniority after layoff in order to qualify for a deferred pension, there is a good argument that if the parties intended to allow such accumulation under subsection 8.2 then the parties would have worded subsection 8.2 in a manner similar to 8.1.

Plaintiffs, however, seem to take the position that "at the time of such layoff" under subsection 8.2 means something other than the time in which an employee "initially" takes layoff status. Subsection 8.2 states that, "any Employee ... who is *initially laid off* or physically disabled *beyond the accumulation limits of 17.2c* of the Basic Agreement *and who, at the time of ... such layoff ...* had at least 15 years of continuous service and whose age and continuous service totaled 75 or more years ..." is entitled to an immediate pension. (Emphasis added.) The plaintiffs' apparent position is that "at the time of such layoff" refers to the time in which the layoff exceeded the accumulation limits under 17.2(c).

Nevertheless, the plaintiffs' interpretation only makes sense if the phrase, "beyond the accumulation limits of 17.2c," modifies the term, "initially laid off," rather

than exclusively modifying the phrase "physically disabled." The problem is that the term, "initially," and the phrase, "beyond accumulation limits," are contradictory. That is, "initially" under its ordinary meaning refers to the "very beginning." THE AMERICAN HERITAGE DICTIONARY 662 (Houghton Mifflin Company ed., 2d College ed., 1982). For employees in the plaintiffs' position, layoff status "begins" at the plant closing date when an employee elects layoff. On the other hand, the time in which accumulation limits expire can be up to five years after the election of layoff status. Because these terms contradict one another, it is hard to envision how an employee could be "initially" laid off "beyond accumulation limits."

Considering that such a reading of subsection 8.2's language seems nonsensical, it appears that the phrase, "beyond accumulation limits of 17.2c of the Basic Agreement," must be modifying the phrase, "physically disabled," and not the phrase, "initially laid off." In fact, any other interpretation either ignores the presence of the term "initially" or it distorts the plain meaning of this term. This means that employees who opt for layoff status due to a plant shutdown qualify for an immediate pension plan under subsection 8.2 only if they satisfy the minimum continuous service requirements *at the date they first opt for layoff status.*[6] Subsection 3.3 of the Pension Plan required the plaintiffs to opt for layoff status at the time of the plant shutdown, and at this time the plaintiffs had not met subsection 8.2's continuous service requirements.

For the foregoing reasons, we agree with the district court's conclusion that the only reasonable interpretation of the CBA does not allow the plaintiffs to creep into an immediate pension plan. Our determination that the CBA does not provide for creep rights as a matter of law is further

---

**6.** The language in the last paragraph of subsection 8.2 and subsection 8.6 is arguably relevant to the interpretation of the Pension Plan. Nonetheless, neither party pointed to the language in these sections, nor did either party indicate how

this language might affect the interpretation of the Pension Plan. We, therefore, did not rely on this language when interpreting the Pension Plan.

bolstered by the fact that the plaintiffs have not offered any extrinsic evidence, other than the fact that there is a post-formation dispute with regard to the appropriate interpretation, in support of their proffered interpretation. Moreover, the plaintiffs concede that the Closure Agreement does not provide them with such creep rights.

### D. *Breach of the Duty of Fair Representation in the Grievance Process*

■ This court has defined duty of fair representation claims very narrowly. Indeed, under our lead case of *Hoffman v. Lonza, Inc.*, 658 F.2d 519, 520 (7th Cir. 1981), this court held that in order to prevail under a claim for breach of the duty of fair representation a plaintiff must prove that the union conduct was "intentional, invidious, and directed at the employee." Therefore, in evaluating claims based on the duty of fair representation this court has focused solely on the union's motive and not the possible inept nature of a union's actions. *Martin v. Youngstown Sheet & Tube Co.*, 911 F.2d 1239, 1248 (7th Cir.1990). *See also Graf v. Elgin, Joliet & Eastern Ry. Co.*, 697 F.2d 771, 779 (7th Cir.1983); *Camacho v. Ritz–Carlton Water Tower*, 786 F.2d 242, 244–46 (7th Cir. 1986), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

Nevertheless, the Supreme Court in *Air Line Pilots Ass'n, Int'l v. O'Neill*, —— U.S. ——, 111 S.Ct. 1127, 1134–35, 113 L.Ed.2d 51 (1991), rejected this court's narrow reading of the duty of fair representation standard.[7] Indeed, the Court in *O'Neill* stated that the duty of fair representation parallels other fiduciary duties and "[j]ust as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in

good faith." *O'Neill*, 111 S.Ct. at 1134. The Court then held that the standard is a tripartite standard where the courts should look to each component separately rather than merging the test into a single requirement of honestly and good faith. *O'Neill*, 111 S.Ct. at 1135. The three separate levels of inquiry under this standard are as follows: (1) did the union act arbitrarily; (2) did the union act discriminatorily; or (3) did the union act in bad faith. *Id.* at 1132–35.

Under *O'Neill* we first evaluate whether the plaintiffs have demonstrated sufficient evidence that the Steelworkers Union acted arbitrarily in failing to process the plaintiffs' grievance. The Supreme Court in *O'Neill*, although rejecting this court's intent standard as the exclusive test, emphasized that the arbitrary prong of the fair representation analysis is very deferential. *O'Neill*, 111 S.Ct. at 1129. This wide degree of deference is warranted because Congress did not intend courts to interfere with the decisions of the employee's chosen bargaining representative. As such, a union only violates the arbitrary prong of the analysis when the union's actions are "so far outside a 'wide range of reasonableness,'" that the actions rise to the level of irrational or arbitrary conduct. *O'Neill*, 111 S.Ct. at 1136 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)). Under this extremely deferential standard, courts should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.

Under this extremely deferential standard, it is hard to see how a decision not to arbitrate a meritless grievance could ever be irrational or arbitrary. Considering that we have already concluded that the plain-

---

**7.** The Court in *O'Neill* stated the following: ALPA argues, as has the Seventh Circuit, that employees "do not need ... protection against representation that is inept but not invidious".... Unlike ALPA, we do not read this passage [from a prior Supreme Court decision] to limit review of a union's actions to "good faith and honesty of purpose," but rather to recognize that a union's conduct must

also be within "[a] wide range of reasonableness." .... [W]e have repeatedly identified three components of the duty, including a prohibition against "arbitrary" conduct. *O'Neill*, 111 S.Ct. at 1134. This language constitutes a clear rejection of this court's narrow interpretation of the duty of fair representation standard.

tiffs' proffered interpretation of the CBA lacks merit as a matter of law, it does not appear that the Steelworkers Union could have acted irrationally or arbitrarily in failing to arbitrate this meritless grievance.

■ It seems to be a different question, however, whether or not a union can discriminatorily or in bad faith refuse to arbitrate a grievance that a court later determines lacks merit as a matter of law, especially when the union is unsure about the merits of an employee's claim at the time of its refusal. Indeed, the record before us contains a damaging affidavit that indicates the Steelworkers Union may have acted with a bad faith purpose when it refused to arbitrate the plaintiffs' grievance. This harmful information is contained in an affidavit by Mr. Cutshaw, the plaintiffs' former attorney. Viewing the evidence in the light most favorable to the plaintiffs, we will assume that the information in the affidavit is true and accurate.

Mr. Cutshaw was at the meeting where the Steelworkers Union's attorney, Mr. Kline, stated that the Union decided to drop the arbitration. According to this affidavit, Mr. Kline told the persons attending the meeting that the Union determined that the plaintiffs' grievance lacked merit. Cutshaw affidavit at 2.

After the meeting was adjourned, Mr. Cutshaw invited Mr. Kline to a coffee shop for a sandwich. Mr. Kline accepted this invitation. While at the coffee shop, Mr. Kline, the Union attorney, indicated that "he felt very bad about dropping the arbitration" and that the plaintiffs got "screwed." Cutshaw affidavit at 3. Mr. Cutshaw in this affidavit then recapped the remainder of his conversation with Mr. Kline in the following manner:

> I [Mr. Cutshaw] informed Mr. Kline that I was also upset that the arbitration was dropped and presented certain arguments relative to my clients' position in the case and regarding the arbitration. Mr. Kline then asked me if I wanted to know the real reason that the Union

dropped the arbitration. I said "sure" and he informed me that, in discussions with Mr. Gottesman, if the union lost the arbitration and if the arbitrator ruled that the Union had bargained away "CREEP" rights, then it would look or be far worse for the Union with respect to the "fair-rep" claim in this action. He further stated that if that happened then we (the class grievants) would have a much better chance of recovery in the above-captioned action....

Cutshaw affidavit at 2.

This admission by the Steelworkers Union's attorney certainly suggests wrongdoing. In short, this admission implies bad faith. This affidavit indicates that the Steelworkers Union dropped what it thought might be a meritorious grievance in order to protect itself from liability in a later suit. Granted, it may sometimes be in the best interests of union members as a whole for a union to drop a claim that the union knows is meritless in order to avoid future litigation expenses. However, the above statement, when read in the light most favorable to the plaintiffs, does not put forth any such selfless motives. Instead, this admission indicates that the Union believed that the plaintiffs' contract claim had some merit and that the Union representatives put their personal interests ahead of the plaintiffs' interests. Such self-protectionist motives are not appropriate for fiduciaries. Accordingly, it appears that the plaintiffs have offered sufficient evidence to raise a factual issue as to whether the Steelworkers Union acted in bad faith.[8]

■ Although the Steelworkers Union's motivations suggest bad faith, it is another question whether or not the plaintiffs have stated a recoverable action. The Supreme Court has indicated that the fair representation analysis in the grievance context is important because it provides employees with recourse when "the contractual processes have been seriously flawed by the union's breach of its duty to represent em-

---

8. Because there is a factual issue raised with respect to whether the Union acted in bad faith, we will not address whether the Union acted

discriminatorily in failing to arbitrate this grievance.

ployees honestly and in good faith and without invidious discrimination or arbitrary conduct." *Hines*, 424 U.S. at 570, 96 S.Ct. at 1059. When, however, the employee's underlying contract claim lacks merit as a matter of law, this purpose is not served in allowing the employee to pursue its claim for breach of the duty of fair representation. Indeed, an employee suffers no injury when the union fails to process a meritless grievance. *United Steelworkers of America v. NLRB*, 692 F.2d 1052, 1058 (7th Cir.1982) ("[s]ince there was no finding that the grievance had merit, it cannot be said that the Union caused any damage...."); *Graf*, 697 F.2d at 776 ("a union's failure to represent a worker in the grievance process injures him only if his grievance has merit—only if the collective bargaining agreement has been violated...."). For these reasons, an employee cannot prevail on a fair representation claim based on the union's failure to process a grievance if the employee's claim lacks merit. *Hines*, 424 U.S. at 570–71, 96 S.Ct. at 1059; *United Steelworkers*, 692 F.2d at 1057; *NLRB v. Eldorado Mfg. Corp.*, 660 F.2d 1207, 1214 (7th Cir.1981) ("[l]iability for failure to process discharge grievances cannot attach unless the grievances would have been meritorious and unless the Union's failure to process was in bad faith.").

We have already determined that the plaintiffs' proffered interpretation of the contract lacks merit as a matter of law. Therefore, fortunately for everyone involved, the Steelworkers Union's actions did not cause the plaintiffs any injury. However, the Union might not be so fortunate the next time around. Nonetheless, because the plaintiffs raised a meritless contract claim, the plaintiffs' claim that the Steelworkers Union breached its duty of fair representation in failing to arbitrate the plaintiffs' grievance cannot withstand summary judgment.[9]

### E. Breach of Contract Claim

As we indicated above, in order to prevail on a claim for breach of contract against Schwitzer, the plaintiffs had to demonstrate that the Union violated its duty of fair representation in failing to arbitrate the grievance. As we just explained, the plaintiffs are not able to prevail under such a claim. Moreover, our earlier contract analysis makes it clear that Schwitzer did not breach its contractual obligations with the plaintiffs in failing to award them immediate pension benefits. Accordingly, we must also affirm the district court's grant of summary judgment on the breach of contract claim against Schwitzer.

### F. Breach of the Duty of Fair Representation in the Negotiation and Ratification Process

■ The plaintiffs also claim that the Steelworkers Union breached its duty of fair representation when it negotiated and obtained the ratification of the Closure Agreement. We begin with an evaluation of the negotiation process.

The plaintiffs have offered no evidence indicating that the Steelworkers Union had bad faith motives when it adopted a Closing Agreement which did not provide the plaintiffs with the desired creep rights. Nor, have the plaintiffs offered any evidence implicating invidious discrimination, which is necessary for the discrimination prong of the fair representation analysis. *O'Neill*, 111 S.Ct. at 1137.

As for the arbitrary prong, plaintiffs argue that the Steelworkers Union violated its duty of fair representation when it negotiated away vested creep rights that existed under the CBA. Nonetheless, we determined above that the CBA did not provide for such creep rights. Accordingly, the Steelworkers Union could not have acted irrationally or arbitrarily in bargaining away creep rights that did not exist.

---

**9.** Granted, this analysis hinges on the merits of the plaintiffs' contract claim. We must make clear, however, that the unfair representation analysis only hinges on the merits of an employee's contract allegations when the employee's allegations are found meritless. That is, a find-ing that an employee's claims for rights under a collective bargaining agreement has merit does not mean that the union breached its duty of fair representation in either bargaining away these rights or in failing to arbitrate grievances based on a deprivation of these rights.

Therefore, the plaintiffs' assertion that the Steelworkers Union breached its duty of fair representation in bargaining away creep rights must fail.

Granted, an employee's claims of unfair representation in the negotiation process do not always rest on the proposition that the Union wrongfully bargained away *preexisting* contractual rights. To the contrary, an employee can argue that a union breached its duty of fair representation in failing to bargain for *new* rights. Nonetheless, this is not the plaintiffs' argument, and even if it were, this argument would not be persuasive in this case.

The evidence indicates that the Steelworkers Union's negotiation decisions were far from arbitrary or irrational. Indeed, it appears that many union members, including the plaintiffs, benefited from other provisions of the Closure Agreement. The record indicates that Schwitzer adamantly insisted that the CBA did not provide for creep rights. The plaintiffs point to no evidence that indicates that the Steelworkers Union acted irrationally, arbitrarily or in bad faith in failing to push this issue.

Considering that the Steelworkers Union did not act arbitrarily in negotiating the Closure Agreement, it follows that it was not irrational or arbitrary for the Union to secure the ratification of this agreement. And, finally, the record contains no evidence indicating that the Union acted discriminatorily or in bad faith in securing the ratification of the Closure Agreement. Indeed, the record indicates that the Union provided adequate notice of the meeting in which this agreement was ratified. Moreover, considering that the Steelworkers Union did not encourage the union members to either vote for or against the Closure Agreement, it appears that the Steelworkers Union acted impartially and fairly toward its members in the ratification process.

## III.

### JURISDICTION OVER THE CLASS

Next, Schwitzer questions whether this court has appellate jurisdiction over the entire class of plaintiffs. Ordinarily, we begin our analysis with a discussion of jurisdiction. However, we chose to reserve this issue because it is clear that this court has jurisdiction over at least one member of the plaintiff class—Paul Ooley. The question which is less clear is whether this court has appellate jurisdiction over the other members of the plaintiff class. Schwitzer argues that we have no jurisdiction over the class members as a whole and, therefore, any appellate decision in this case is applicable only to Paul Ooley. The district court entered final judgment on July 6, 1990. On August 6, 1990, the first notice of appeal was filed. (Cas. No. 90–2729). This notice was timely. The caption and the contents of this first notice of appeal named only "Paul Ooley, et al." On August 15, 1990, this court *sua sponte* issued an order directing appellant to state why the appeal should not proceed as to Paul Ooley, as opposed to the remaining unmentioned class members, in light of the Supreme Court's decision in *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988).

In August of 1990, the plaintiffs filed a motion to extend time for the filing of a second notice of appeal. On August 31, 1990, the district court granted plaintiffs' motion, and a second notice of appeal was filed that same day. (Cas. No. 90–3104).

Schwitzer and the Steelworkers Union jointly moved to dismiss the appeal on two grounds: (1) the initial notice of appeal (Cas. No. 90–2729) which named only "Paul Ooley, et al." failed to satisfy the requirements under Fed.R.App.P. 3(c), except as to Paul Ooley, and (2) the second notice of appeal (Cas. No. 90–3104) was defective because the district court abused its discretion in granting the motion to extend the time for filing the second notice of appeal.

■ We agree that the failure to appropriately name the members of the class in either the caption or the body of the notice of appeal did not satisfy the specificity requirements of Fed.R.App.P. 3(c). *See Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988); *Hartford Casualty Ins. Co. v. Borg-War-*

*ner Corp.,* 913 F.2d 419, 423 (7th Cir.1990). Accordingly, we have jurisdiction over Paul Ooley, and not the remainder of the class members, under this first notice of appeal.

■ We do not agree, however, that the second notice of appeal is deficient. Rule 4(a) gives the district court the authority to extend the thirty-day time limit for the filing of a notice of appeal upon a showing of excusable neglect or good cause. Fed. R.App.P. 4(a). We will not disturb a district court's determination of excusable neglect or good cause unless we find a clear abuse of discretion. *Redfield v. Continental Casualty Corp.,* 818 F.2d 596, 602 (7th Cir.1987). Such an abuse exists if no reasonable person could agree with the district court decision. *United States v. U.S. Currency in the Amount of $103,387.27,* 863 F.2d 555, 561 (7th Cir.1988).

■ Schwitzer first argues that the sparse nature of the district court order requires this court to conclude that the district court abused its discretion in granting the time extension. We do not find this argument convincing on these facts. Granted, the district court order fails to detail its reasons for granting the extension. Nonetheless, the district court order indicates that it is based on the arguments made in the plaintiffs' Motion to Extend Time for Filing Notice Of Appeal. Therefore, the district court's order merely adopted the reasoning in the plaintiffs' motion. Such an adoption does not constitute an abuse of discretion.

In their motion, the plaintiffs indicated that the district court sent its notice of judgment to the plaintiffs' attorney's former address, despite the fact that the plaintiffs' attorney had filed a change of address with the court. Therefore, the plaintiffs' counsel did not cause this delay in the receipt of the notice of judgment. The motion further alleges that the failure to appropriately name the class was an inadvertent error.

Schwitzer argues in its brief that the district court abused its discretion in granting the extension because ignorance of the law is not sufficient grounds for excusable neglect. Nonetheless, this is not merely a case where ignorance of the law resulted in excusable neglect. Rather, this is a case where delay resulted in excusable neglect.

The deadlines set forth in the Federal Rules of Appellate Procedure ordinarily provide ample time to assess the efficacy of appeal and to research the appropriate procedure for making such an appeal. Therefore, district courts should not loosely grant time extensions whenever there is a slight delay in the mail. Nonetheless, the Federal Rules of Appellate Procedure envision that the parties will be able to use the time period allotted for filing a notice of appeal in order to assess the efficacy of appeal and to research the appropriate procedure for making such an appeal. Indeed, this court has recognized that "failure to learn of the entry of judgment" will support a finding of excusable neglect under appropriate circumstances. *Redfield,* 818 F.2d at 602. If there is a significant delay between the time in which the notice of judgment is mailed and the time in which this notice is received, and if this delay is the fault of the court, then we cannot say that a district court abused its discretion in concluding that such a delay left counsel with insufficient time to both research the efficacy of the appeal and to research the law regarding the necessary procedure for preserving such an appeal. We realize that the plaintiffs' motion for extension of time does not mention the date of the motion or the extent of the delay caused by the mailing of the notice of judgment to the incorrect address. Nonetheless, considering the degree of discretion we give to the trial court's excusable neglect determinations, we cannot say that the district court abused its discretion in finding excusable neglect on these facts.

Moreover, the plaintiffs' motion verifies that copies of this motion were sent to the defendants' counsel by certified first class mail on August 30, 1990. Accordingly, the district court did not abuse its discretion in granting the extension, despite Schwitzer's allegations that none of the defendants received notice of the plaintiffs' motion for an extension of time until September 7, 1990.

## IV.

## CONCLUSION

For the foregoing reasons, this court has appellate jurisdiction over Paul Ooley and the entire plaintiff class. Also, for the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the defendants, Schwitzer and the Steelworkers Union.

AFFIRMED.